*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DEBORAH MICHELE BRANHAM,
                    *Plaintiff-Appellant,*

            *v.*

GANNETT SATELLITE INFORMATION
NETWORK, INC., d/b/a THE DICKSON HERALD
GROUP,

                    *Defendant-Appellee.*

No. 09-6149

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 08-00700—Todd J. Campbell, Chief District Judge.

Argued: August 4, 2010

Decided and Filed: September 2, 2010

Before: BOGGS, SILER, and MOORE, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Robert C. Bigelow, DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellant. Charles K. Grant, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C., Nashville, Tennessee, for Appellee. **ON BRIEF:** Robert C. Bigelow, Martin D. Holmes, DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellant. Charles K. Grant, Ben H. Bodzy, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C., Nashville, Tennessee, for Appellee.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Plaintiff Deborah Branham brought suit under the Family and Medical Leave Act ("FMLA") after being terminated from her job as a receptionist for *The Dickson Herald*, a newspaper owned by Gannett Satellite

1

Information Network, Inc. ("Gannett"), for excessive absenteeism. The district court granted summary judgment to Gannett. The court held that although Branham produced a medical certification of her need for leave within the fifteen-day period afforded by Department of Labor regulations, Gannett was entitled to deny her leave based on an earlier "negative certification"—a form from a physician indicating that Branham was not incapacitated. Because we conclude that Gannett never properly triggered Branham's duty to provide a medical certification, we **REVERSE**.

## I. BACKGROUND

The district court discussed the facts material to the dispute between Branham and Gannett:

> Plaintiff was first employed as a receptionist for *The Dickson Herald* from November 21, 2003 to January 15, 2004. Plaintiff was terminated from her position for excessive absenteeism.
>
> Plaintiff was rehired as a receptionist by *The Dickson Herald* on July 26, 2005, and was terminated on November 24, 2006 for failure to follow the company attendance policy. Plaintiff's regularly scheduled work hours were from Monday through Friday, 8:00 a.m. to 5:00 p.m. Plaintiff's immediate supervisor was Tracy Buhler, the Office Manager for *The Dickson Herald*. Ms. Buhler reported to Buddy Hargett, the General Manager for *The Dickson Herald*. Mr. Hargett reported to Terri Leifeste, the Vice President of Middle Tennessee Community Newspapers ("MTCN"), which publishes *The Dickson Herald*.
>
> Plaintiff's absences in November, 2006 began on November 7, 2006. In her deposition, Plaintiff testified that she was absent from her employment on Tuesday, November 7, 2006 because her son was ill, and she called and so advised Ms. Buhler. The next day, Wednesday, November 8, 2006, the Plaintiff sent an email to Ms. Buhler at approximately 9:26 a.m. stating that she would not be in because her son was still sick. On Thursday, November 9, 2006, the Plaintiff left a voice mail message for Ms. Buhler stating that she was sick and would be absent from work. On Friday, November 10, 2006, Plaintiff again left a message for Ms. Buhler that she was sick and would be absent from work.
>
> On Monday, November 13, 2006, Plaintiff's husband left a message for Ms. Buhler that Plaintiff was sick and that he would be taking her to the doctor. On that day, Plaintiff was examined by Dr.

Pamela Singer at the Dickson Family Medical Group. According to the Plaintiff, she told Dr. Singer that she was suffering from migraine headaches, menstrual problems, depression, insomnia, and a stomach virus. Dr. Singer found the Plaintiff['s exam] to be "normal" and expected her to return to full work duty on November 14, 2006. Plaintiff testified that she talked with Ms. Buhler later that day and told her that Dr. Singer had released her to come to work the following day. Plaintiff testified that she also told Ms. Buhler that she wasn't feeling well, and would need to be absent to attend other doctors' appointments during November and December.[FN1] Plaintiff further testified that Ms. Buhler told her to come in to the office and sign a form for short term disability[] leave. According to the Plaintiff, Ms. Buhler also told her she could do some work from home or after hours to help with the month-end "close-out."

> [FN1]Ms. Buhler testified that she recalled this conversation as having taken place on November 15, 2006. For purposes of the Defendant's summary judgment motion, the Court will assume the conversation took place on the date claimed by the Plaintiff.

The next day, Tuesday, November 14, 2006, Plaintiff did not report to work during her regular shift. According to Dr. Singer, the Plaintiff was released to return to work on this day. The Plaintiff did come into work late at night to complete some paperwork and fill out a medical certification form.

Plaintiff did not report to work on Wednesday, November 15, 2006, and Thursday, November 16, 2006, but claims to have worked from home on postal reports and subscription issues. Ms. Buhler testified in her deposition that she faxed the medical certification form to Dr. Singer's office on November 15, 2006, and due to a malfunction with Dr. Singer's fax machine, had to fax the form again on November 16, 2006.

On Friday, November 17, 2006, Plaintiff did not report to work during regular office hours, but states that she worked after hours. That same day, according to Ms. Buhler, Dr. Singer's office faxed the completed medical certification form back to Ms. Buhler. Through that form, Dr. Singer indicated that Plaintiff's condition commenced on November 10, 2006, and that she could perform her full duty as of November 14, 2006, and did not require intermittent leave.

On Monday, November 20, 2006, Plaintiff did not report to work or call in to explain her absence. Ms. Buhler met with M[T]CN Vice President Terri Leifeste and Human Resources Vice President Kathy Cheatham on that day to discuss Plaintiff's absence. Ms. Cheatham

advised Ms. Buhler to contact the Plaintiff and let her know that her job would be in jeopardy unless she could produce other medical documents confirming her need to be off. Ms. Buhler advised the Plaintiff as she was instructed. Plaintiff told Ms. Buhler that the wrong doctor filled out the certification form, and stated that Dr. Koster Peters, her primary care physician at the Dickson Family Medical Group, could provide clarification if Defendant faxed the certification form to him. Ms. Buhler advised the Plaintiff to call Kathy Cheatham.

On Tuesday, November 21, 2006, Plaintiff did not report to work. Plaintiff testified that she spoke with Ms. Cheatham that day, and Ms. Cheatham expressed her concern that it was taking the Plaintiff so long to return a medical certification form to support her absences. Also, on November 21, 2006, Ms. Buhler attempted to fax the certification form to Dr. Peters, as requested by Plaintiff, but had problems with the fax machine. Consequently, Ms. Buhler and Ms. Leifeste decided that Alvin Leifeste, the Circulation Manager for the MTCN group, would take the certification form completed by Dr. Singer to the physicians' office the next day and speak with the doctors in person.

On Wednesday, November 22, 2006, Plaintiff did not report to work. That same day, Mr. Leifeste took the form completed by Dr. Singer, as well as a blank certification form, to the offices of Dr. Singer and Dr. Peters at the Dickson Family Medical Group. Mr. Leifeste spoke with an employee at the physicians' office, Katie Moran, and told her there was a question about the accuracy of the form completed by Dr. Singer, and asked if the doctor would review the form for accuracy, and explained that he had a blank form the doctor could use if the completed form was inaccurate. Ms. Moran said she would take the form back to the doctor, along with the Plaintiff's medical records, for review. When Mr. Leifeste suggested that Dr. Peters review the form, Ms. Moran told him that Dr. Peters would not fill out the form because he was not the doctor who had actually seen the Plaintiff. When she returned from speaking with Dr. Singer, Ms. Moran told Ms. [sic] Leifeste that the doctor had looked at the certification form, that it was accurate, and that she did not wish to make any changes.

The next day, Thursday, November 23, 2006, was Thanksgiving Day, and the Defendant's offices were closed.

On Friday, November 24, 2006, Plaintiff did not report to work. Kathy Cheatham spoke with Terri Leifeste by telephone on that day, and they jointly decided to terminate Plaintiff's employment. Terri Leifeste called the Plaintiff to advise her of the termination, but could not reach her and left a message for the Plaintiff to call back. When the Plaintiff

did not call back, Ms. Leifeste directed Ms. Cheatham to draft a termination letter to send to the Plaintiff by registered mail.

On Monday, November 27, 2006, Plaintiff did not report to work. On that same day, Ms. Cheatham drafted and sent the termination letter, over the signature of General Manager Buddy Hargett, to the Plaintiff by registered mail. The termination letter was dated November 24, 2006, the day the termination decision was made, and states that Plaintiff's termination was based on her failure to follow company attendance policy by being absent from work since Dr. Singer released her to work on November 14, 2006.

On Tuesday, November 28, 2006, Plaintiff did not report to work. The termination letter was mailed at 9:44 a.m. on that same day. Plaintiff testified that she spoke on the telephone with Ms. Cheatham, who told her that she had been terminated.

After 6:00 p.m. that evening, the Defendant received a faxed certification form signed by a nurse practitioner, Cheryl Seefeldt, who worked in that same practice as Dr. Singer and Dr. Peters. Ms. Seefeldt's certification contradicts the certification of Dr. Singer with respect to the duration of the Plaintiff's incapacity. According to Nurse Seefeldt, Plaintiff's illness began on May 6, 2006 and was expected to prevent her from returning to work until January 1, 2007. However, Plaintiff admits that Dr. Singer was the only health care provider to examine her between November 7, 2006 and November 24, 2006.

*Branham v. Gannett Satellite Info. Network, Inc.*, No. 3:08-700, 2009 WL 2588744, at *1–4 (M.D. Tenn. Aug. 19, 2009) (citations omitted).

On July 18, 2008, Branham filed a complaint in federal district court alleging that Gannett violated the FMLA by interfering with her use of FMLA leave and by terminating her in retaliation for seeking FMLA leave. Branham moved for partial summary judgment on May 4, 2009, and Gannett moved for summary judgment on July 6, 2009. On August 19, 2009, the district court denied Branham's motion and granted summary judgment in full to Gannett. The court observed that an employer may require an employee to provide a medical certification supporting her request for FMLA leave and that the employer must allow the employee fifteen days to provide such certification. *Id.* at *6. The court acknowledged that Gannett fired Branham before the fifteen-day period expired and that Branham provided a supporting certification on the fifteenth day,

but it concluded that Gannett was entitled to terminate Branham on the eleventh day, when it received a "negative certification" from Dr. Singer and confirmed that neither Dr. Singer nor Dr. Peters would certify Branham's need for FMLA leave. *Id.* at *7. "Under these circumstances," the district court explained, "the Court is not persuaded that the Defendant was required to delay its termination decision until receipt of the second, unanticipated medical certification." *Id.* Branham then filed this appeal.

## II.  ANALYSIS

### A.  Standard of Review

We review a district court's grant of summary judgment de novo and draw all reasonable inferences in favor of the nonmoving party. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Our focus must be on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### B.  Summary Judgment

"The FMLA entitles an 'eligible employee' to up to twelve weeks of leave per year if the employee has a 'serious health condition' that prevents the employee from performing the functions of her job." *Hunter v. Valley View Local Schs.*, 579 F.3d 688, 690 (6th Cir. 2009) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA provides a private right of action to employees to protect their rights to such leave under two different theories: the "interference" or "entitlement" theory, under which employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA rights, 29 U.S.C. § 2615(a)(1); and the "retaliation" or "discrimination" theory, under which employers may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA, § 2615(a)(2). *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Branham filed suit

under both theories, alleging that Gannett interfered with her FMLA rights by denying her leave and retaliated against her for taking leave by terminating her.

To prevail on either her interference claim or her retaliation claim, Branham must prove that she was entitled to FMLA leave. *See Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577–78 (6th Cir. 2007); *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The essence of Gannett's summary-judgment argument is that she cannot establish this entitlement.

Gannett advances two bases on which to affirm the district court's judgment. First, it contends that Branham cannot prove that she had a serious health condition that prevented her from performing the functions of her job—reasoning on which the district court ultimately did not rely. Second, Gannett reiterates the argument accepted by the district court, that Gannett was entitled to terminate Branham for excessive absenteeism on the basis of the negative certification received from Dr. Singer. We address each in turn.

### 1. Whether Branham Can Prove a "Serious Health Condition"

As noted, Branham cannot prevail on her interference or retaliation claims unless she sought leave for an FMLA-qualifying reason, namely, that she had a "serious health condition" that prevented her from doing her job. 29 U.S.C. § 2612(a)(1)(D). The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Branham does not contend that she ever required inpatient care, so her claim turns on her need for continuing treatment. Department of Labor regulations define "continuing treatment" as "[a] period of incapacity (i.e., inability to work . . . ) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves: (A) [t]reatment two or more times by a health care provider . . . or (B) [t]reatment by a health care provider on at least one occasion which results in a

regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114(a)(2)(i) (2006) (amended 2009) (emphasis omitted).[1]

Gannett argues that Branham cannot prove that her condition involved "continuing treatment" because she cannot establish that she was incapacitated for a period of more than three days. This argument is unavailing. To be sure, Branham admitted in her deposition that she was not sick on Tuesday, November 7, or Wednesday, November 8, days on which she missed work in order to care for her son. She further admitted that she either performed some work or did not work but was "not incapacitated" on every day on which her office was open between Tuesday, November 14, and Tuesday, November 28. Dist. Ct. Document ("Doc.") 35-1 (Branham Dep. at 148–51). This testimony cannot be construed as a legal admission, however. Branham agreed that she was "not incapacitated" only after the following exchange with defense counsel:

> Q: And then on the 15th you say you worked from home, true?
> A: True.
> Q: But you were not incapacitated, true?
> A. *I still wasn't feeling well.*
> Q: I understand, but you weren't incapacitated. You obviously were able to do *some* work, true?
> A: True.

Doc. 35-1 (Branham Dep. at 149) (emphases added). Plainly, Branham understood defense counsel's use of the word "incapacitated" to refer to the inability to do *any* work.[2] In fact, "incapacity" refers to the inability to "perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1)(D), which in turn is defined as being "unable to work at all or . . . unable to perform any one of the essential functions of the

---

[1]The Department of Labor recently promulgated revised regulations interpreting the FMLA. Those regulations took effect on January 16, 2009, after the events giving rise to this suit occurred. *See* 73 Fed. Reg. 67934. Therefore, we apply the regulations in place at the time of the events in question. *See Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 336 n.9 (6th Cir. 2009) (unpublished opinion).

[2]Revealingly, in another part of her deposition, Branham testified that she "was still out of it pretty much most of the day on the 14th," that she *was* incapacitated on November 15, and that she was not "feeling up to par" on November 15 or 16. Doc. 35-1 (Branham Dep. at 102).

employee's position," 29 C.F.R. § 825.115 (2006) (amended 2009). That is, a person can be incapacitated despite being able to do some of her regular work. Here, the very basis of Branham's suit is that she was not able to perform the essential functions of her job throughout the period of her absences in November 2006. She submits her testimony, her medical records, and Nurse Practitioner Seefeldt's certification as evidence of that incapacity.[3]

Even if Branham's deposition testimony were viewed as preventing her from arguing incapacity from November 14 through 28—which, to reiterate, it does not—Branham consistently has maintained that she was incapacitated between Thursday, November 9, and Monday, November 13. That Thursday, she left Buhler a voicemail message indicating that she was sick; that Friday, she left Buhler another voicemail message indicating that her migraines were keeping her home; then, her "migraine was so bad [that she] had been in bed for the entire weekend and could not tolerate any light or sound," Doc. 35-1 (Branham Dep. at 79); and the following Monday, Branham's husband informed Gannett that he was taking her to the doctor. These facts indicate that Branham was incapacitated for five consecutive calendar days. Gannett points to different evidence: a document from Branham's medical records in which Dr. Singer listed the duration of Branham's illness as "2 days." Doc. 35-6 at 78 (Medical Records). But Branham does not accept Dr. Singer's evaluation and provides her own testimony and a conflicting medical opinion in support of her position. This is the essence of a factual dispute that precludes summary judgment.

In short, Branham has advanced sufficient evidence to create a genuine issue of material fact on the incapacity element of the "continuing treatment" requirement.

Gannett next argues that Branham cannot establish "continuing treatment" because she cannot show that she was treated by a health care provider twice within her

---

[3]Gannett argues that Seefeldt's certification "is nonsensical on its face" because it "purports to certify Branham for a condition commencing on May 6, 2006, and continuing through November 28, 2006," a period during which Branham showed up to work most of the time. Appellee's Br. at 14 n.6. This is an argument that Seefeldt's certification is unpersuasive. It is an argument that can be made at trial to a jury, which reasonably could rely on Seefeldt's certification and the rest of Branham's evidence that her illnesses prevented her from performing the functions of her job.

period of incapacity or that a regimen of continuing treatment resulted from the single doctor's visit she did have. Again, Gannett is wrong on both counts.

First, there is evidence that Branham was treated by two health care providers during her period of incapacity: Dr. Singer on November 13, and Nurse Practitioner Seefeldt on November 28. The issue is whether the Seefeldt visit qualifies as a "treatment . . . by a health care provider" under 29 C.F.R. § 825.114(a)(2)(i) (2006). The regulations' definition of "treatment" states that the term "includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.114(b) (2006). Seefeldt's certification includes several diagnoses, reflecting that some sort of examination took place, and Gannett appears to acknowledge as much. *See* Appellee's Br. at 14 n.6 (stating that Branham was "seen by" Seefeldt). The regulations also define a "health care provider" to include nurse practitioners such as Seefeldt. 29 C.F.R. § 825.118(b)(2) (2006).

It is irrelevant that Branham saw Seefeldt after Gannett received Dr. Singer's negative certification and after Gannett terminated her. At this stage of the analysis, the question is not whether Gannett was entitled to terminate Branham when it did based on the FMLA's certification requirements—an issue we discuss below—but rather whether Branham can prove that she suffered from a "serious health condition." That is, the question is whether Branham can prove to a jury that she received "continuing treatment" by showing that she received "[t]reatment two or more times by a health care provider." 29 C.F.R. § 825.114(a)(2)(i)(A) (2006). The only timing requirement relevant to this inquiry is that the second treatment must occur during the same period of incapacity as the first, defined to include the original period of more than three consecutive calendar days of incapacity and any subsequent period of incapacity relating to the same condition. *See id.*; *Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1321–23 (10th Cir. 2005). Branham saw Nurse Practitioner Seefeldt about the same medical issues for which she saw Dr. Singer: migraines, anxiety, depression, and insomnia. Thus, taken in the light most favorable to Branham, the evidence indicates that she was treated by Dr. Singer and Nurse Practitioner Seefeldt, both qualified health care

providers, during the same period of incapacity, which exceeded three days. This is enough to show a genuine issue of material fact regarding whether Branham suffered from a "serious health condition involving continuing treatment," 29 C.F.R. § 825.114(a)(2) (2006), rendering summary judgment inappropriate.

Second, Branham may also be able to use her examination by Seefeldt to show a "serious health condition" based on "[t]reatment by a health care provider on at least one occasion which result[ed] in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114(a)(2)(i)(B) (2006). Seefeldt's certification indicates under the heading "Regimen of Treatment" that Branham required "greater than 5" physician visits, including "several appointments with orthopedist, ob/gyn, and [primary care physician] over the next month and a half for surgery, medication adjustments, injections." Doc. 28-2 at 3 (Seefeldt Cert.). Seefeldt also wrote that she anticipated referring Branham to additional health care providers, that Branham would need to work less than her normal schedule, and that she could return to full duty on January 1, 2007. Branham testified in her deposition that she did see other physicians after this visit, including an obstetrician/gynecologist to investigate whether her migraines were hormonal and to treat fibroids, an orthopedist for a cyst on her wrist and her trigger-finger condition, and her primary-care physician, Dr. Peters, for her migraines and insomnia. Thus, this evidence of a regimen of continuing treatment following the Seefeldt visit also precludes summary judgment.

### 2. Whether Gannett Could Terminate Branham on November 24, 2008, Based on Dr. Singer's Certification

Gannett's second argument for summary judgment is its theory that the FMLA permitted it to terminate Branham based on her failure to present a medical certification of her incapacity. To assess this argument, we review the regulatory framework in which the certification requirement exists.

To claim FMLA leave when the circumstances giving rise to the need for such leave are not foreseeable, an employee must give notice to her employer "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R.

§ 825.303(a) (2006). "The employee need not expressly assert rights under the FMLA or even mention the FMLA." *Id.* § 825.303(b) (2006). She "gives sufficient notice when [she] provides enough information for the employer to reasonably conclude" that leave is needed for a serious health condition. *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003). After an employee gives notice, "[a]n employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a). Such a request for medical certification must be in writing and must detail the employee's specific obligation to provide certification and the consequences of failing to do so. 29 C.F.R. §§ 825.301(b)(1)(ii), 825.305(d) (2006) (amended 2009); *Perry*, 353 F.3d at 514. The request may be oral only if (1) the employee handbook or other written policy documents (if they exist) clearly provided that medical certification would be required, *and* (2) the employee sought FMLA leave some time in the previous six months and received written notice of the medical-certification requirement at that time. 29 C.F.R. § 825.301(c)(2)(ii) (2006); *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 566 (6th Cir. 2005).

The FMLA requires an employee to deliver the certification "in a timely manner." 29 U.S.C. § 2613(a). The regulations specify that when leave is unforeseeable, the employer must give the employee at least fifteen calendar days to provide the requested certification, and more time if it is not practicable under the circumstances to do so within fifteen days. 29 C.F.R. § 825.305(b). "If an employee fails to provide a medical certification within" the period of fifteen days (or longer, depending on the circumstances), "the employer may delay the employee's continuation of FMLA leave." 29 C.F.R. § 825.311(b) (2006) (amended 2009). "If the employee never produces the certification, the leave is not FMLA leave." *Id.* If, on the other hand, the employer terminates the employee before giving her the full fifteen-day period to provide a certification, the employer has violated the FMLA. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555 (6th Cir. 2006).

Gannett contends (1) that Branham was required to provide a medical certification supporting her need for FMLA leave; (2) that before the fifteen-day period

expired, Branham's doctor provided a certification indicating that Branham did *not* require leave; and (3) that Gannett was entitled to rely on that negative certification and was not required to allow Branham the remainder of the fifteen-day period to secure a second certification supporting her claim for leave. Branham responds that she disputed Dr. Singer's assessment and that the FMLA guaranteed her fifteen days to secure a second opinion. The parties thus focus our attention on an issue of first impression in this circuit: when an employee provides a negative certification—that is, a certification indicating that she does not have a serious health condition that prevents her from performing her job—must the employer wait the full fifteen days prescribed by regulation before denying leave on the basis of that negative certification?

The district court answered this question "no." It relied primarily on *Nawrocki v. United Methodist Retirement Communities, Inc.*, 174 F. App'x 334 (6th Cir. 2006) (unpublished opinion), which upheld summary judgment for an employer that terminated an employee for absenteeism after the employee's doctor submitted a certification form listing various medical conditions but indicating that the employee would not need to miss work. *Nawrocki*, however, does not resolve the question presented in the case at bar. First, *Nawrocki* was an unpublished and nonprecedential opinion. Second, the opinion held only that "an employer is entitled to rely on a 'negative certification' in denying FMLA leave," *id.* at 338; the employee there did not claim that the employer had violated the fifteen-day requirement, and the opinion made no mention of the requirement at all. Third, *Nawrocki*'s holding relied entirely on *Stoops v. One Call Communications, Inc.*, 141 F.3d 309 (7th Cir. 1998), which likewise did not involve the fifteen-day requirement and which included language in tension with the conclusion of the district court in the instant case. *See Stoops*, 141 F.3d at 313 (observing that "nothing in the [FMLA] or regulations limits the employee's ability to produce a medical opinion that contradicts a prior negative certification originally provided by the employee"). Thus, the issue presented by the parties remains unresolved in this circuit.

We need not decide the issue today, however, because there is an independent fatal flaw in Gannett's argument for summary judgment. Branham satisfied her

notification requirement on November 13, 2006, when she asked Buhler "about taking leave, because [she] still wasn't feeling well and had numerous doctors' appointments scheduled for November and December." Doc. 35-1 (Branham Dep. at 88) (internal quotation marks omitted). But Gannett never properly triggered the additional duty to provide a medical certification supporting her claim. The district court found that Gannett requested certification on November 13, the day on which Buhler told Branham over the phone to come to the office and sign a short-term-disability form to "see if she qualified for anything." Doc 28-3 (Buhler Dep. at 51). In her deposition, however, Buhler testified that "Michele and I never at any time discussed FMLA leave." Doc 28-3 (Buhler Dep. at 54). It is true that Gannett's short-term-disability form doubled as its FMLA leave form, but it is clear that Buhler communicated to Branham no information about the FMLA certification requirement, the fact that such certification was due within fifteen days, or the consequences of failing to return an adequate certification. Doc. 28-3 (Buhler Dep. at 58) (stating that she did not provide Branham a deadline); Doc 28-4 (Kling Dep. at 40–41) (stating that Buhler should have provided this information). Even if Buhler *had* conveyed all the appropriate information, her oral request would have been insufficient to activate Branham's certification duty because there is no evidence that Branham requested leave and received written notification of the requirement in the previous six months,[4] or that the requirement appeared in the employee handbook that Branham should have received when she first joined Gannett in November 2003. *See* Doc. 28-4 (Kling Dep. at 13–21) (reading sections of handbook about FMLA but not mentioning certification requirement).

We therefore must conclude that Gannett was not entitled to delay or deny leave to Branham on the basis of the certification requirement. "Because there is no evidence that defendant requested medical certification pursuant to the requirements of the FMLA,"—and, in fact, all the evidence confirms that Gannett did *not* make a proper request—"[Branham's] failure to provide medical certification does not support

---

[4]Nancy Kling, who testified as a Federal Rule of Civil Procedure 30(b)(6) witness for *The Dickson Herald*, stated that "Branham used the FMLA the first time that she was employed by us, so I would think that she was familiar with the procedure." Doc. 28-4 (Kling Dep. at 15). That request for leave, however, took place well over six months before the November 2006 request.

summary judgment for defendant." *Perry*, 353 F.3d at 514.  Because Branham's own testimony constitutes sufficient evidence to establish a genuine issue whether she suffered from a serious health condition that prevented her from doing her job, this case must be remanded for a jury to decide whether she was entitled to leave under the FMLA.

### III.  CONCLUSION

For the reasons explained above, we hold that the district court erred when it granted summary judgment to Gannett based on the submission of a negative medical certification indicating that she could return to work.  Branham has produced sufficient evidence to create a genuine issue of material fact about her entitlement to FMLA leave, and Gannett was not permitted to deny her leave based on the certification requirement when it never properly requested certification or informed her of the consequences of failing to provide the same, as required by Department of Labor regulations. Accordingly, we **REVERSE** the district court's grant of summary judgment to Gannett and **REMAND** the case for further proceedings consistent with this opinion.