NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0960n.06

No. 10-6366

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 29, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| AMY RITENOUR, | ) |
| | ) |
|     Plaintiff-Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| STATE OF TENNESSEE DEPARTMENT | ) MIDDLE DISTRICT OF TENNESSEE |
| OF HUMAN SERVICES, | ) |
| | ) |
|     Defendant-Appellee. | ) |

Before: CLAY AND GIBBONS, Circuit Judges; and KORMAN, District Judge.[*]

**JULIA SMITH GIBBONS, CIRCUIT JUDGE.** Plaintiff-appellant Amy Ritenour brought

this action against the State of Tennessee Department of Human Services ("TDHS") pursuant to the

Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*. Ritenour alleged that TDHS

violated the FMLA by interfering with her right to take intermittent FMLA leave and by retaliating

against her for attempting to take FMLA leave. Ritenour appeals the district court's grant of TDHS's

motion for summary judgment. For the reasons given below, we affirm.

I.

The record reveals the following facts. Ritenour was hired by TDHS on May 16, 2007, as

a one year interim employee. On April 16, 2008, she became a full-time TDHS employee in a Clerk

_____

[*]The Honorable Edward R. Korman, United States District Judge for the Eastern District of
New York, sitting by designation.

1

2 position. In her new position, Ritenour's direct supervisor was Tanesha Hooper. Hooper's supervisor was Shar Amador, who reported to Kelvin Meeks. As an eligible full-time state employee, Ritenour earned one day (7.5 hours) of annual leave (vacation time) and one day of sick leave per month worked. By August 2008, Ritenour had used most of her accrued sick leave and annual leave.

Ritenour is a single mother of three children. Her eldest son has bipolar disorder, which is a chronic condition, and oppositional defiant disorder. He also has a history of suicide attempts and behavior problems. Ritenour had obtained therapy for him with Centerstone[1] in Nashville. In August of 2008, her son's behavior had worsened, and Ritenour felt that she needed to stay with him for his own safety and to prepare for and participate in intensive in-home therapy services, which were also to be provided by Centerstone.

In order to facilitate her eldest son's treatment, take her children to doctor's appointments, and look for new housing, Ritenour sought to take leave between August 20, 2008 and the end of September 2008. However, because she knew that she did not have the necessary annual leave or sick leave time accrued, Ritenour sought information from Hooper about whether she could obtain unpaid leave. Hooper referred Ritenour to Gary Stockton, a TDHS human resources analyst.

Ritenour recalled meeting with Stockton in mid-August during her break. Stockton told Ritenour that she did not qualify for FMLA leave because she was an interim employee and that she should ask her supervisor about taking leave. Ritenour understood that she was not an interim

---

[1]Centerstone is a not-for-profit provider of community-based behavioral healthcare, which provides mental health services throughout Tennessee and Indiana.

employee at the time but was unable to clarify this with Stockton before she had to return to work.

Following this meeting, Ritenour believed that August 20 would be her last day of work until she

had the in-home services in place for James. Ritenour believed she would be on leave because "no

one said I didn't get leave" and "no one said that I wasn't approved."

Although Ritenour asserts that she believed that she was on leave after August 20, 2008, she

reported to work on August 21, 2008, because her unit needed help at the front desk and she thought

it would only be for half a day. After August 21, Ritenour was absent from work for the last week

of August and the first week of September. The Employee Attendance and Leave Authorization

Forms—completed by Hooper in Ritenour's absence—indicate that Ritenour was on unapproved

leave from August 25 through August 29, 2008, and from September 2 through September 5, 2008.

Despite her assertion that she believed that she was on approved leave after August 20,

Ritenour engaged in a series of communications with TDHS employees that focused on her

continued efforts to obtain leave or that involved requests for time off in September. On September

2, Stockton spoke with Ritenour on the phone[2] about her options for leave.[3] Stockton explained that

---

[2]Telephone calls made at TDHS are recorded, with the exception of a few upper level employees, including Kelvin Meeks and Shar Amador. Transcripts of telephone conversations between Ritenour and Stockton and Ritenour and Hooper were agreed upon by both parties to facilitate the proceedings.

[3]During their conversation, Stockton told Ritenour that she could "apply for family medical leave." However, the conversation then continued:

> Stockton: The only way that you gonna be authorized any time off, is it a family medical emergency?

> Ritenour: Not exactly.

Ritenour only had seven hours of leave accrued as of August 15, and since Ritenour confirmed that she did not work between August 25 and 29, he concluded that Ritenour had already been out for "at least four days without pay." Stockton instructed Ritenour to call Hooper, make her aware of the situation, ask for the needed time off, and request that Hooper write a memo to Meeks requesting that Ritenour receive the time off. Ritenour spoke with Hooper on September 3 and 5, regarding her absences and her leave status, and agreed that she would return to work on September 8.[4]

As discussed with Hooper, Ritenour returned to work on Monday, September 8, 2008, and reported to work through September 10. On September 10, Ritenour printed out the TDHS employee handbook and brought it to Stockton. She told Stockton that she needed leave and that she believed that she was in fact qualified to take leave under the handbook's terms. Stockton told Ritenour to put her request for leave in writing, to supply a start and end date, and to provide a reason for the leave in the written request. After being told that Hooper was out on vacation for the week, Stockton told Ritenour to provide him with a copy of the request.

Over her lunch hour, Ritenour typed up her leave request and testified that she left copies of it for Hooper and Stockton. Both Hooper and Stockton, however, failed to find their copies of the letter. Ritenour did not return to work at TDHS after September 10, 2008.

---

Stockton: Then you can't apply for family medical leave, you can always request special leave without pay.

[4]Hooper told Ritenour that although she should come back to work on September 8, she would be placed on "leave restriction," meaning that a sick day would be unexcused without a doctor's note until Ritenour had accrued a week of both annual leave and sick leave (which would take about five months).

On September 19, Ritenour spoke to both Hooper and Stockton over the telephone. Stockton expressed his belief that Ritenour had been on unapproved leave since September 10 and emphasized that submitting a leave request does not guarantee leave. Hooper reminded Ritenour of their earlier conversation, in which Ritenour reassured Hooper that she would not miss work again after returning to work on September 8, and pointed out that upon returning from vacation she had learned that Ritenour had, in fact, missed more work. Although Stockton and Hooper emphasized the need for an official request for leave and approval of a leave request, Ritenour did not provide another copy of her leave request to Stockton or Hooper.

Ritenour did not report to work on September 22, 23, 24, or 25, and her Employee Leave and Attendance form lists the absences as unapproved leave.[5] Hooper testified that Ritenour also failed to call in on those dates. Ritenour could not remember whether she called in on September 22, 23, 24, or 25.[6] After Ritenour had been absent from work without approval for leave and without calling in for more than three consecutive days (referred to as a no call/no show), Hooper recommended that Ritenour be discharged on the grounds of job abandonment.

Tennessee Department of Personnel Rule 1120-2-.14 is titled "Tenure, Suspension and Separation" and addresses job abandonment:

---

[5]Ritenour went to the emergency room on September 18 and was treated for stress-induced hives. Ritenour received two sets of work excuses from her doctors for September 18 and 19, and September 22 through 25, but did not provide these excuses to TDHS.

[6]The TDHS call log indicates that a call from Ritenour's home telephone number was placed to Gary Stockton's number on September 22, 2010. The call was forty-four seconds in duration. The log does not show any calls from Ritenour to Hooper between September 22 and 25.

> Job Abandonment. An employee who is absent from duty for more than three (3) consecutive business days without giving notice to the appointing authority or appropriate manager concerning the reason for such absence and without securing permission to be on leave, or who fails to report for duty or to the immediate supervisor or appointing authority within (2) business days after the expiration of any unauthorized leave of absence, absent unusual circumstances causing the employee's absence or preventing the employee's return, is considered as having resigned not in good standing.

The TDHS employee handbook distributed at new employee orientation also contained a subheading on "Absenteeism." The subsection instructed:

> If you must be late for work or absent because of illness or for an unforeseen circumstance, <u>personally</u> notify your appropriate manager or immediate supervisor as soon as possible by telephone. Certain supervisors may designate a specific call-in time.

> When you have to be late or absent, it is important that you give your supervisor maximum advance notice so that replacement arrangements or work assignments can be made. Your supervisor will cooperate with you on these occasions if you will personally give as much advance notification as possible. However, excessive absenteeism is inappropriate. Remember that supervisors must account for and approve all employee absences.

The handbook also elaborated upon the need for supervisor authorization for leave and job abandonment under the "Sick Leave" subsection. The provision explained:

> <u>If you are not at work during your regular hours, you must be on authorized leave</u>. This means that your supervisor knows of and has approved your absence. In accordance with the law and rules, job abandonment occurs when an employee is absent from work without approval for three consecutive workdays or two consecutive workdays following the expiration of any authorized leave. In the case of job abandonment, the department considers that the employee resigned "not in good standing." Therefore, it is imperative that you keep your supervisor informed of your need for leave as it arises.

In light of the above provisions and her belief that Ritenour was absent on unauthorized leave and had been a no call/no show for more than three business days, Hooper met with Meeks and

Amador to discuss her recommendation that Ritenour be discharged. After discussing the lack of contact between September 22 and 25, reviewing the call log to confirm that no calls were made to Hooper from Ritenour on those dates, and reviewing Hooper's September 19 phone conversation with Ritenour, the recommendation was approved. Hooper submitted a memo, dated September 25, 2008, recommending the "non-retention of Amy Ritenour" to TDHS Commissioner Virginia Lodge. Lodge then sent Ritenour a letter informing her of her "separation from State service effective September 25, 2008."

Meeks testified that he was not aware at the time of the meeting to discuss Ritenour's termination that Ritenour's eldest son is bipolar, that Ritenour's children have disabilities, or that her children were receiving services from Centerstone. He testified that the recommendation was made on the basis of job abandonment and that the additional information would not have changed his recommendation. Meeks also testified that he was not aware that Ritenour had requested leave through the end of September or that she had asked Stockton for FMLA leave.[7]

II.

On September 2, 2009, Ritenour filed suit against TDHS alleging interference and retaliation claims under the FMLA and sex discrimination and retaliation claims under the Tennessee Human

---

[7]Post-termination, Ritenour made efforts to obtain certifications in order to comply with FMLA requirements. Centerstone staff completed medical certification paperwork on October 28, 2008, requesting FMLA leave for Ritenour in connection with her son's mental health condition from August 20, 2008 through October 1, 2008. Ritenour also had her physician, Dr. Michelle Rorie, complete a leave certification form on November 11, 2008, regarding the stress-induced hives Ritenour suffered in September 2008.

Rights Act ("THRA"). The district court dismissed Ritenour's THRA claims against TDHS for lack of subject matter jurisdiction.

TDHS then moved for summary judgment on Ritenour's FMLA claims. On October 4, 2010, the district court granted TDHS's motion for summary judgment. The district court found that there were genuine issues of material fact about "whether [Ritenour] was eligible for FMLA leave, whether she was entitled to take FMLA leave, whether she gave TDHS notice of her intention to take FMLA leave, and whether TDHS denied her FMLA benefits to which she was entitled." However, the district court found that even assuming that Ritenour was entitled to take unpaid FMLA leave, "there is still no dispute that [Ritenour] failed to contact her supervisor, Tanesha Hooper, on September 22, 23, 24 and 25 in accordance with the generally applicable [T]DHS policies on absenteeism and job abandonment." The district court found that Ritenour had failed to provide any evidence to generate a genuine issue of material fact about whether TDHS's reason for terminating her was legitimate and unrelated to her exercise of FMLA rights. The district court concluded that Ritenour had not produced evidence from which the jury could conclude that TDHS's proffered reason for termination was pretextual. As a result, the district court awarded summary judgment to TDHS on Ritenour's interference and retaliation claims.

III.

This court reviews "a district court's grant of summary judgment *de novo* and draw[s] all reasonable inferences in favor of the nonmoving party." *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56. A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive a "properly supported motion for summary judgment," the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Ritenour makes two main arguments seeking to invoke the doctrine of equitable estoppel. First, Ritenour argues that TDHS misrepresented to her whether she could qualify for family medical leave and that she reasonably relied on the representations by attempting to obtain other forms of leave, which resulted in her termination when she failed to comply with the call-in requirements. As a result, Ritenour claims that TDHS should be equitably estopped from claiming that her leave was not qualified under the FMLA. Second, Ritenour argues that TDHS should be estopped from using the call-in policy to justify termination when there has been a request for FMLA leave and TDHS has waived the policy that it later contends the employee violated.

"[I]n certain circumstances, equitable estoppel applies to employer statements regarding an employee's FMLA eligibility, preventing the employer from raising non-eligibility as a defense." *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554 (6th Cir. 2009). In order to prevail on an equitable estoppel argument, a plaintiff must demonstrate "(1) a definite misrepresentation as to a material fact, (2) a reasonable reliance on the misrepresentation, and (3) a resulting detriment to the party reasonably relying on the misrepresentation." *Id.* at 557.

9

Assuming that Stockton's statements were a misrepresentation, Ritenour has still failed to show the necessary resulting detriment. To begin with, the district court assumed that Ritenour was entitled to FMLA leave, and TDHS does not explicitly challenge Ritenour's eligibility for FMLA leave. It is therefore unnecessary for Ritenour to invoke equitable estoppel to prevent TDHS from challenging her eligibility for family medical leave. Ritenour also claims that equitable estoppel should apply because Stockton's statements make it unclear what type of leave Ritenour would have been on and whether she would have had to call in for each day of the leave. However, Ritenour does not allege that Stockton (or any of her TDHS supervisors) told her that she was approved for another type of leave (for example, special leave) or that employees on approved FMLA leave do not have to follow the call-in policy. As a result, Ritenour cannot establish the necessary detrimental reliance because she cannot show that she would have been in compliance with the call-in policy but for the alleged misrepresentation. Consistent with this reasoning, the district court found that Ritenour failed to raise a genuine issue for trial regarding equitable estoppel because Ritenour did not argue that she was ever told that she was exempt from the daily call-in requirement.

Ritenour also attempts to invoke equitable estoppel to prevent TDHS from relying on its call-in and absenteeism policies to justify her termination. Ritenour argues that *Allen v. STHS Heart, LLC*, No. 3:09-0455, 2010 WL 2133901, at *10 (M.D. Tenn. May 21, 2010), supports the use of the doctrine of equitable estoppel to prevent an employer from relying on company policy to support a termination decision when a FMLA leave request has been made and the company has previously waived the policy. *STHS Heart* is of course not binding on this court and in any event is distinguishable. In that case, the plaintiff, who had been granted intermittent FMLA leave, was told

10

by her supervisor that she did not have to follow the generally applicable call-in procedure when her medical condition caused her to arrive late to work. *Id.* at \*5. As a result, the district court found that if the plaintiff reasonably relied on the supervisor's instructions that pre-shift notice of tardiness was not required, then the employer was estopped from taking those alleged attendance policy violations into account in its termination decision. *Id.* at \*10–11. Here, Ritenour has not alleged that her supervisors told her that she did not have to comply with the absenteeism and call-in policies. Instead, her argument appears to be that since she violated the policies before without adverse consequences,[8] her employers should thereafter be prohibited from invoking the policies as the justification for any adverse employment action against her. Ritenour points to no misrepresentation by TDHS about the application of the attendance policies. Although she contends that she "may have relied upon" the content of her phone conversations with Hooper and Stockton in failing to call in to work, Ritenour does not specify where in the conversations she was told that she did not have to call in. Instead, she appears to argue that because the conversations focused on what was necessary to obtain approved leave, she would be justified in assuming that the policies no longer applied. A failure of her supervisors to reiterate in every conversation with Ritenour that she needed to follow generally applicable policies was not a misrepresentation regarding the application of the policies. As a result, Ritenour cannot rely on equitable estoppel to prevail on her claims.

B.

---

[8]For example, Ritenour admits that she did not comply with the call-in policy in August and September 2008. Ritenour was absent without calling in on September 16, 17 and 18, and was not disciplined. Similarly, she missed the last week of August and the first week of September with only periodic contact with work and, according to TDHS, no authorization for the leave.

Under the FMLA, eligible employees are entitled to up to twelve workweeks of leave during any twelve month period if the employee has a "serious health condition that makes the employee unable to perform the functions" of her job, or if the employee needs such leave in order to care for a child with a "serious health condition." 29 U.S.C. § 2612(a)(1)(C), (a)(1)(D). When medically necessary, leave may be taken intermittently or on a reduced leave schedule. *Id.* § 2612(b)(1). The "Enforcement" provision of the FMLA provides employees with a private right of action to protect their rights to FMLA leave. *Id.* § 2617(a).

"This court recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). The interference provision of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." 29 U.S.C. § 2615(a)(1). A violation of the act exists if an employer interferes with the FMLA-created right to medical leave or to reinstatement after qualified leave. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). In order to prevail under the interference theory, a plaintiff must prove that: "(1) she was an eligible employee, (2) [the employer] is a covered employer, (3) she was entitled to leave under the FMLA, (4) she gave [the employer] notice of her intent to take leave, and (5) [the employer] denied her FMLA benefits or interfered with FMLA rights to which she was entitled." *Hoge*, 384 F.3d at 244. Because the relevant issue is whether the employer provided the employee with the entitlements provided by the FMLA, *Arban*, 345 F.3d at 401, an employer may violate § 2615(a)(1) "regardless of the intent behind its conduct."

12

*Hoge*, 384 F.3d at 244. However, the right to non-interference with medical leave is not an absolute one. *Arban*, 345 F.3d at 401. "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the conduct." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (citing *Arban*, 345 F.3d at 401). Because we have recognized that "the FMLA is not a strict-liability statute," *id.* at 507, "the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." *Verkade v. United States Postal Serv.*, 378 F. App'x 567, 575 (6th Cir. 2010) (internal quotation marks omitted). If an employer proves a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee, the plaintiff must "rebut the employer's reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).[9]

In an unpublished decision, this court held that an employer could terminate an employee on FMLA leave for violating the more stringent requirements of a concurrently run paid sick leave policy, which included a call-in requirement. *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 394–97 (6th Cir. 2009). Because the call-in procedures established the obligations of employees on any type of leave, whether pursuant to the FMLA or not, this court found that the employer was not liable for interfering with the employee's right to take FMLA leave. *Id.* at 395–96. Other courts have also affirmed grants of summary judgment in favor of employers on employee FMLA

[9]This court recently clarified in *Donald* that the *McDonnell Douglas* burden-shifting framework applies to interference as well as retaliation claims under the FMLA. *Donald*, 667 F.3d at 762.

interference claims where the employees, who were found to be entitled to FMLA leave, violated applicable attendance policies. *See Bacon v. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711, 714–15 (8th Cir. 2008); *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709–10 (7th Cir. 2002). In a factual situation somewhat closer to the present case, the Tenth Circuit upheld summary judgment in favor of the employer on an employee's FMLA interference claim where the employee attempted to apply for a medical leave of absence and then violated the employer's call-in policy (before her application was processed) by failing to "show up to work for three consecutive days and [failing to] notify her supervisor of those absences." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 874, 877–78 (10th Cir. 2004). The Tenth Circuit found that the employee would have been terminated "irrespective of whether or not these absences were related to a requested medical leave" and that the "request for an FMLA leave does not shelter [the employee] from the obligation, which is the same as that of any other Honeywell employee, to comply with Honeywell's employment policies, including its absence policy." *Id.* at 878.

Ritenour argues that the district court erroneously construed facts and drew inferences in favor of TDHS to conclude that TDHS had a legitimate business reason for her termination that was unrelated to the exercise of her FMLA rights. Ritenour contends that the district court inappropriately focused on the legitimate business reason for Ritenour's termination that TDHS put forward and ignored discrepancies in the testimony of TDHS witnesses regarding the rationale for Ritenour's termination.

TDHS admits for the purposes of appeal that, as the district court found, there are genuine issues of material fact about Ritenour's eligibility for FMLA leave, whether she was entitled to take

such leave, whether she gave notice to TDHS about her intention to take FMLA leave, and whether

she was denied FMLA benefits to which she was entitled. Thus, the first four elements of Ritenour's

interference claim are not in dispute. Our inquiry focuses on whether Ritenour can establish the fifth

element of her interference claim: whether TDHS denied her FMLA benefits or interfered with

FMLA rights to which she was entitled.

Even assuming that Ritenour was entitled to take FMLA leave and that TDHS interfered with

Ritenour's FMLA rights, TDHS has provided a legitimate reason for Ritenour's dismissal that is not

related to her request for FMLA leave. Hooper testified that she recommended Ritenour's

termination because Ritenour did not call in, in violation of the job abandonment policy, and that she

could not recall considering any other information in making her decision. Meeks and Amador also

testified that the termination recommendation was made because of job abandonment.

Ritenour cannot succeed on her interference claim because she has not set forth specific facts

showing that there is a genuine issue for trial as to whether her termination was related to the

exercise of FMLA rights. There is no dispute that on September 19, Ritenour spoke with Stockton

who informed her that she was out on unapproved leave, that he believed that Ritenour had not

requested the time off prior to taking it, that Ritenour had failed to provide a doctor's note or written

statement indicating why she was away from work, that an employee away from work for the amount

of time that Ritenour had been away needs to be on some type of approved leave, that Ritenour's

letter had not been received, that Ritenour had to make every effort to personally get her leave

request to her supervisor, and that simply submitting a request without obtaining its approval does

not allow an employee to be absent from work. After her conversation with Stockton, Ritenour did

not bring in the requested documentation for her absences and admits that she did not call work on September 23 and 24 and did not come in to work between September 22 and 25. TDHS phone records indicate that no calls were made from Ritenour's home number to Hooper between September 22 and 25, and Hooper testified that she was not contacted by Ritenour. Under the job abandonment policy applicable to TDHS employees, "an employee who is absent from duty for more than three (3) consecutive business days without giving notice to the appointing authority or appropriate manager concerning the reason for such absence and without securing permission to be on leave . . . absent unusual circumstances causing the employee's absence . . . is considered as having resigned not in good standing." Despite the fact that Ritenour knew that she was on unapproved leave and had not provided the information regarding her absence to her supervisor, she did not make contact with TDHS from September 22 through September 25, she did not provide medical excuses, and she made no request for leave after being told that her letter had not been received. Hooper recommended Ritenour's non-retention for job abandonment based on her failure to make contact. Further, Ritenour knew that the absenteeism policy required that absent employees call-in their absences in order to give their supervisor appropriate notice to make alternative work assignment arrangements. TDHS's job abandonment policy applies to all employees who are absent from duty without approval. The enforcement of that policy against Ritenour was not related to Ritenour's request for FMLA leave because the policy applies to employees who are absent from work without approval for any reason. Accordingly, Ritenour's interference claim fails, unless she can show that TDHS's proffered reason for the adverse employment decision was pretextual. *See Donald*, 667 F.3d at 762.

"A plaintiff can demonstrate prextext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Ritenour has failed to demonstrate an issue of material fact as to whether TDHS's proffered reasons for her termination were pretextual. Ritenour has not demonstrated that the stated reason for her discharge, her violation of the absenteeism policies due to her no call/no show from September 22 through September 25, has no basis in fact. Her claim that she did not violate the call-in policy as it applied to her lacks support in the record. While Ritenour was not previously subject to discipline for her failures to call-in her absences, this is not evidence that she did not violate the attendance and absenteeism policies or that the policies applied to her differently. Ritenour had printed out the employee handbook and knew of the absenteeism policy and had previously called in her absences. Hooper also spoke with Ritenour on September 3 and 5 about her problematic attendance and told Ritenour that she would allow Ritenour to return to work but Ritenour would be placed on leave restriction. This gave Ritenour notice that she was expected to report to work, that her prior actions regarding attendance were problematic, and that she would not be allowed any further unexcused absences. Further, her TDHS supervisors consistently stated that they believed that the policies applied to Ritenour and that she had violated them. Hooper, Meeks, and Amador consistently testified that they made the decision to recommend non-retention to the commissioner because of Ritenour's failure to call in her absences and the lack of contact from Ritenour. Even crediting Ritenour's contention that she should have been given written notice as to what call-in requirements applied to her, Ritenour has not presented evidence that her TDHS supervisors made the adverse

17

employment decision based on anything but their honestly held belief that Ritenour had violated

applicable absenteeism and job abandonment policies. *See Braithwaite v. Timken Co.*, 258 F.3d 488,

494 (6th Cir. 2001). Further, to the extent that Ritenour argues that pretext may be inferred from the

fact that the call-in policy was not enforced consistently against her, she has not carried her burden

of raising a genuine issue of material fact on this point. Here, TDHS enforced a generally applicable

policy that was directly related to the conduct at issue. Although Ritenour's supervisors likely could

have enforced the policy against Ritenour for earlier periods of no contact, Ritenour's supervisors

attempted to work with her to help her comply with what they believed were the necessary

procedures for obtaining approved leave. Ritenour did not adduce evidence demonstrating that the

policy was not enforced against other employees similarly absent on unapproved leave, or that the

policy was simply not enforced in general.

Ritenour also argues that the close temporal proximity of her requests for FMLA leave and

her termination and the fact that TDHS suggested that she apply for special leave instead of FMLA

leave "raise issues of pretext." "Unlike its role in establishing a prima facie case, 'the law in this

circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" *Seeger v.*

*Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Donald*, 667 F.3d at 763); *see*

*also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001).[10] However, this

---

[10]Our case law when evaluating the import of temporal proximity as evidence of causation as part of a *prima facie* case of *retaliation* is less clear. *See Krumheuer v. GAB Robins N. Am., Inc.*, No. 10-4396, 2012 WL 1700702, at *5 (6th Cir. May 16, 2012) (discussing lack of a uniform approach with regard to establishing a causal connection "solely on the basis of temporal proximity"). Indeed, although "[s]ubstantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone," *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010), "our case law . . . recogniz[es] the

court has found that "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.*, 321 F. App'x 423, 426 (6th Cir. 2009) (citation omitted). Given that TDHS contends that it decided to recommend the non-retention of Ritenour after she violated the absenteeism policy and the fact that Ritenour violated the policy because she thought she was out on leave, temporal proximity is almost unavoidable and under the circumstances does not appear to be particularly probative of pretext. Indeed, it would be difficult to avoid finding an employer's enforcement of a no-call/no-show absenteeism policy such as TDHS's pretextual if temporal proximity alone was enough to establish that the proffered reason for discharge was pretextual.

The fact that Stockton suggested that Ritenour take special leave also does not generate an issue of material fact regarding whether the proffered reason for Ritenour's discharge was pretextual. Stockton did not make the decision to recommend Ritenour's non-retention. Further, the record suggests that Stockton presented special leave as an option in an effort to help Ritenour obtain the time off that she sought. Ritenour did not set forth evidence indicating that Stockton's suggestion should lead to the inference that Hooper, Meeks, or Amador were hostile to FMLA leave requests and that the proffered reason for Ritenour's discharge was pretextual.

---

possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recogniz[es] that often evidence in addition to temporal proximity is required to permit the inference. *Id.* at 401. In the context of establishing a *prima facie* case of FMLA retaliation—in contrast to establishing a pretext in an interference claim—we have found that temporal proximity alone may suffice. *See Seeger*, 681 F.3d at 283–84; *DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004).

Ritenour also refers to "varying reasons for [her] termination" offered by TDHS and argues that the inconsistency raises an inference of pretext sufficient to withstand a motion for summary judgment. Ritenour contends that TDHS's explanation is inconsistent because it cited Ritenour's notification that she was on unapproved leave and needed to return to work, the absences between September 22 and 25, and the prior unexcused absences to explain the decision to terminate Ritenour's employment.

An employer's changing rationale for making an adverse employment decision can call into question the credibility of the proffered reason and serve as evidence of pretext. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). However, the "varying reasons" at issue in this case do not seem to be similar to the typical shifting justifications that have been found sufficient to raise a genuine issue of material fact regarding pretext. *See Harris v. Metro. Gov't of Nashville*, 594 F.3d 476, 487 (6th Cir. 2010). Ritenour argues that it is not clear that the termination decision was based on the no call/no show from September 22 through September 25. She claims that the official termination letter refers to the September 19 phone call between Hooper and Ritenour as a motivator for the termination decision and claims that the phone call "included neither notice of unapproved leave nor any demand to return to work." However, the termination letter does not explicitly cite the September 19 phone call as the grounds for the non-retention decision. Instead, the letter appears to cite the phone call for context. The phone call with Hooper clearly is a continuation of the prior conversations between Hooper and Ritenour regarding Ritenour's status as absent on unapproved leave. Hooper testified that she recommended Ritenour's termination due to her failure to make contact or call in her absences from September 22 through September 25. The

20

memorandum sent to Commissioner Lodge cited the failure to make contact on the dates in question.

Both Meeks and Amador also testified that the decision to recommend non-retention was made after

confirming that there was a lack of contact on the days in question. Amador did indicate that the fact

that Ritenour had not reported to work after being told to request special leave factored into her

decisionmaking process because employees are required to report to work until their leave is

approved and Ritenour had been told that she was to return to work. However, this does not

represent a varying reason for Ritenour's termination. Instead, in context, it appears to have been

another factor Amador considered in determining whether it was appropriate to hold Ritenour to the

attendance policy. Further, invoking prior unexcused absences does not necessarily represent a

shifting rationale as the central issue remains Ritenour's attendance, and the prior unexcused

absences might reasonably have led TDHS to decide that it was necessary to hold Ritenour to the

attendance policy.

Ultimately, Ritenour's pretext argument seems to rest on the timing of TDHS's decision to

terminate her and the fact that she had not previously been disciplined for earlier violations of the

attendance policy. Yet temporal proximity is not enough to demonstrate that an employer's

proferred reason was a pretext for discrimination, *Seeger*, 681 F.3d at 285, and Ritenour has failed

to produce sufficient evidence to suggest that the decision to enforce the attendance policy against

was prompted by an improper motive. As a result, Ritenour has not carried her burden to raise a

material issue of fact as to whether the proffered reason for termination was pretextual and her

interference claim fails.

C.

Ritenour also argues that the evidence reveals that questions of fact exist regarding whether the legitimate, non-discriminatory reasons TDHS proffered to explain its decision to terminate Ritenour were pretext for FMLA retaliation against Ritenour.

For a claim brought under the retaliation theory, the motive behind the employer's decision to take the adverse employment action matters. *Edgar*, 443 F.3d at 508. "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Id.* The burden-shifting framework established from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to FMLA retaliation claims.[11] *Edgar*, 443 F.3d at 508; *Skrjanc*, 272 F.3d at 315. Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. 411 U.S. at 802. A plaintiff can make out a *prima facie* case by showing: (1) "she availed herself a protected right under the FMLA . . . , (2) she suffered an adverse employment action, and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Edgar*, 443 F.3d at 508. If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the dismissal. *Id.* If the defendant articulates such a reason, the plaintiff then bears the burden of demonstrating that the given reason is pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804–06.

---

[11]As noted above, *Donald* found that the tripartite test also applies to FMLA interference claims. *Donald*, 667 F.3d at 762.

Assuming, as the district court did, that Ritenour could establish a *prima facie* case, the burden shifts to TDHS to present a legitimate non-discriminatory reason for Ritenour's termination. TDHS met its burden by introducing evidence that Ritenour's supervisors terminated her for her failure to comply with the absenteeism policies by failing to make contact with TDHS and call in her absences for four days in a row. Ritenour must then carry her burden of demonstrating that TDHS's proffered reason for her termination is pretextual. The pretext analysis of her interference claim applies to Ritenour's retaliation claim as well. As discussed above, Ritenour has not met her burden to show that TDHS's proffered reason was pretextual. As a result, her retaliation claim fails.

IV.

For the foregoing reasons, we affirm the district court's decision.