NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0258n.06

No. 12-2230

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Apr 04, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LINDA MARTINSON, | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| REGENTS OF THE UNIVERSITY OF | ) | COURT FOR THE EASTERN |
| MICHIGAN, a constitutional body corporate; | ) | DISTRICT OF MICHIGAN |
| CAROL LOVELAND-CHERRY, individually | ) | |
| and in her official capacity; JUDITH LYNCH- | ) | |
| SAUER, individually and in her official | ) | OPINION |
| capacity; and BONNIE HAGERTY, | ) | |
| individually and in her official capacity, | ) | |
| | ) | |
|     Defendants-Appellees. | ) | |
| | ) | |

Before: DAUGHTREY, GIBBONS, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Linda Martinson was expelled from the School of Nursing at the University of Michigan ("University") in November of 2007. After unsuccessfully seeking readmission through the University's internal review process, Martinson sued the Board of Regents and several School of Nursing administrators, relying primarily on 42 U.S.C. § 1983. The District Court dismissed the vast majority of Martinson's claims under Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6) but allowed her procedural due process claim against the administrators in their individual capacities to proceed to summary judgment. The claim was then dismissed under Rule 56, the District Court having determined that

Martinson received all the process that she was due. Martinson now appeals the summary dismissal of her procedural due process claim and the dismissal of her substantive due process claim at the pleading stage. For the reasons below, we AFFIRM the dismissal of both claims.

## I.

### A.    Factual Background

In August of 2007, Martinson began an accelerated, second-career nursing program at the University's School of Nursing. By her own admission, she began having performance problems in one of her clinical courses the next month. Martinson's daughter recently had received an unexpected diagnosis, and, on September 17, 2007, Martinson informed the course instructor, Diane Bohn, of her daughter's medical problems. Citing its accelerated pace, Bohn recommended that Martinson consider leaving the nursing program. According to Bohn, the workload and stress level would only increase with time. Martinson decided to stay, however, and she felt that her relationship with Bohn "rapidly deteriorated" from that point forward.

On October 8, 2007, Martinson received a mid-semester warning from Bohn that detailed several deficiencies in her performance, including failure to timely complete certain tutorials, general disorganization in planning and implementing patient care, failure to communicate with patients, and failure to meet weekly expectations. Martinson signed the warning but, indicating that it was "factually inaccurate" and contained "glaring omissions," noted that she did so with "severe reservations."

Three days later, Martinson told some fellow students that she was in danger of failing and allegedly demanded that they help her. Several students indicated that Martinson's attitude was hostile, and many expressed feelings of fear and discomfort. Later that same day, Martinson confronted one of the nurses in the locker room about negative comments that she allegedly had communicated to Bohn about Martinson. The nurse reported the incident to Bohn and later testified that Martinson's conduct and demeanor had frightened her.

At various times between September 17, 2007, and October 16, 2007, Bohn communicated with several School of Nursing Administrators—Bonnie Hagerty, Director for Undergraduate Programs and Associate Professor; Judith Lynch-Sauer, Director for the Office of Student Affairs and Clinical Assistant Professor; and Carol Loveland-Cherry, Executive Associate Dean for Academic Affairs and Professor—about Martinson's performance problems and involved them in meetings with Martinson. Martinson was "not receptive" to the criticism offered by the administrators at these meetings. After one such meeting on October 12, 2007, Martinson felt that Lynch-Sauer and Hagerty "had developed a strong, personal dislike for [her], wanted to expel her, and were looking for a justification for the same."

Lynch-Sauer stated that an early October meeting that she and Hagerty had with Martinson "to try to help her do some problem solving and get back on track" was not productive: "Martinson saw only one solution and that was to change clinical instructors as she felt [Bohn] was the cause of her problems." Lynch-Sauer and Hagerty agreed to meet with Martinson again and to include

Bohn. In the meantime, they requested that Martinson "look at where she was having difficulty in the course and . . . come up with some ideas about how best to address them."

Lynch-Sauer, Hagerty, and Martinson reconvened with Bohn one week later. According to Lynch-Sauer, Martinson had not developed an action plan and "was very adamant that it was up to [Bohn] to do so." Bohn, on the other hand, had developed some guidelines for Martinson, but Martinson would not respond to them, saying "that she had been advised by a friend to say nothing" and that "the only solution was to change instructors." When she was informed that replacing Bohn was not possible, Martinson "became very angry and the tone of her voice became threatening." Martinson said that "something would be happening but wouldn't say what this would be." Both Lynch-Sauer and Hagerty testified that they felt threatened or unnerved by this comment and by Martinson's behavior.

According to Hagerty, several of Martinson's classmates asked to meet with Hagerty and Lynch-Sauer to express concerns about Martinson's behavior, which Hagerty described as "increasingly erratic." Hagerty also stated that patients expressed concerns about Martinson's performance and behavior. One of Martinson's clinical group members stated that she no longer would meet with Martinson in person, "even in public places," requesting transfer to another group if Martinson insisted otherwise. Another complained of an "air of discomfort" in meetings with Martinson, describing a disagreement that resulted in a verbal "attack" by Martinson and expressing "a sense of fear" that "similar tirades would result" any time Martinson did not get her way.

On October 16, 2007, Bohn filed a report with Loveland-Cherry in which she alleged that Martinson had violated the student code of conduct. The next day, Loveland-Cherry and Hagerty met with Martinson to discuss the report. At Loveland-Cherry's request, two University public safety officers also attended the meeting.

Martinson was again "unreceptive," and she received a letter and a copy of the code of conduct from Loveland-Cherry at the conclusion of the meeting. The letter advised Martinson that the administration had received reports that she may have violated the code of conduct. The conduct at issue included Martinson's being on unit without faculty supervision, confronting clinical staff in an argumentative manner, and engaging in extended and hostile interactions with fellow students and faculty. The letter also stated that Tara Engholm, Loveland-Cherry's executive secretary, would contact Martinson later that day to schedule a preliminary hearing and that a full hearing by the Committee on Academic Admissions and Scholastic Standing ("CAASS") would follow. Finally, the letter instructed Martinson not to contact program staff, faculty, or students, and not to attend clinical classes or be present on clinical units "[u]ntil the potential Code violation c[ould] be resolved via established procedure[.]" Martinson also received a no-trespass citation from the public safety officers that subjected her to arrest upon entering any buildings owned or leased by the University.

On October 18, 2007, the day after the meeting, Loveland-Cherry submitted a request to the Vice-President of Student Affairs, Dr. E. Royster Harper, seeking Martinson's immediate removal from the School of Nursing. Dr. Harper concluded that Martinson's conduct did not warrant

immediate removal under either the University's emergency mental health policy or its bylaws for behavioral misconduct. He noted, however, that the reports of Martinson's conduct were "indeed troubling," approved of continued monitoring of Martinson, and "highly recommended" that Martinson be referred to campus counseling services for an assessment.

On October 19, 2007, Engholm sent an email to Martinson after making several phone calls to her to schedule the preliminary hearing. Engholm's email informed Martinson that the preliminary hearing had been scheduled for Monday, October 22, 2007, at 9:30 A.M. and requested that Martinson respond immediately by phone or email if she could not attend. Martinson responded that she was not able to attend the preliminary hearing.

On October 22, 2007, Loveland-Cherry sent Martinson a second letter and a summary of the incidents comprising the possible code of conduct violation. The letter explained that Engholm would contact Martinson again to schedule the preliminary hearing and stated that the matter automatically would be forwarded to CAASS if the preliminary hearing could not be scheduled within thirty days. Although the summary of incidents did not name individual students, it detailed in six, single-spaced pages several instances of hostile and intimidating conduct by Martinson that allegedly interfered with "the ability of other students, faculty, and staff . . . to participate in the School's educational programs." Additionally, the summary stated the following:

> Based on reports from faculty, students, and staff, a picture emerges of a student whose behavior is unpredictable—ranging from intense controlled quiet to agitated, angry [sic] characterized by yelling and encroachment on others [sic] personal space. Ms. Martinson, [sic] consistently challenges others even when they are trying to help her, blames others for her lack of performance, refers to personal stresses that she is

experiencing but when offered options for assistance lashes out saying that individuals are being "too personal," and refuses any suggestions for assistance from resources such as [campus counseling services]. In fact, she has become angry whenever [campus counseling services] are suggested. Her fellow students have indicated to faculty their discomfort and fear with [sic] Linda's behaviors towards them and the clinical faculty member, [Bohn].

Engholm sent Martinson a follow-up email on October 30, 2007. The email's subject line read "RESPONSE REQUIRED - Preliminary Hearing," and its body advised Martinson that the preliminary hearing had been rescheduled for Monday, November 5, 2007, at 8:00 A.M. The email also provided the location of the preliminary hearing and asked Martinson to confirm her attendance before 1:00 P.M. the next day. Martinson did not respond until November 5, 2007, after the preliminary hearing had begun, and she did not attend the hearing. It was determined at the preliminary hearing that Martinson's case should be advanced to CAASS for review on an expedited basis. A hearing before a CAASS panel was scheduled for November 9, 2007.

According to Martinson, her schedule had not permitted her to respond to Engholm's email "in a timely fashion," and she would not have been able to prepare an adequate defense for the preliminary hearing because it was scheduled during the last week of classes, which was "very busy." Martinson also complained that she had not been provided with several documents referenced in the summary of incidents that she had received from Loveland-Cherry on October 22, 2007.

In the days leading up to the November 9 CAASS hearing, several students sent emails to Hagerty and Lynch-Sauer that accused Martinson of hostile and unprofessional conduct. Among

other things, the students accused Martinson of putting her head in the windows of people's cars to prevent their driving away from her and expressed concerns about Martinson's "volatility," her "potential for aggression," and their safety. On November 7, 2007, Loveland-Cherry attempted to hand Martinson a packet of information regarding the CAASS hearing, but Martinson would not accept it. Accordingly, Loveland-Cherry sent Martinson an email with the packet of information attached. Martinson never opened the attachment, and she did not attend the CAASS hearing on November 9.

At the CAASS hearing, the evidence included testimony from Bohn, Lynch-Sauer, and Hagerty, as well as several written statements and emails from students. The CAASS panel also noted that Martinson had a criminal record for assault. The panel ultimately found that Martinson had violated the provision of the code of conduct that required nursing students to "maintain compassionate and caring relationship [sic] with colleagues and others with a commitment to the fair treatment of individuals . . . [and to avoid] any and all prejudicial actions, any form of harassment or threatening behavior, or disrespect for effect [sic] of one's actions on others." Bohn suggested that rather than being expelled Martinson should be strictly monitored until she had addressed some personal issues.

A copy of the CAASS panel report was sent to Martinson on November 14, 2007, along with exhibits, informing Martinson that a final decision would be rendered on November 16, 2007, and advising her that she could submit a statement to CAASS for consideration before that time.

Martinson submitted no statement to CAASS prior to November 16, and CAASS approved her immediate and permanent expulsion from the University on that date.

Martinson submitted a statement to CAASS after her expulsion was approved, detailing facts that she allegedly would have presented at the CAASS hearing "had [she] received sufficient time and opportunity." The statement failed to address any of the allegations regarding Martinson's hostile and threatening behavior. Martinson then appealed her expulsion to the University's Grievance Review Board ("GRB"). The GRB agreed with Martinson, finding that she had not been given adequate time to respond to the charges against her and recommending that a new CAASS panel be convened. But the School of Nursing rejected the GRB's recommendation, Dean Kathleen Potempa having determined that the board failed to "take into account the full history of all attempts to communicate with [Martinson] both for the Preliminary Inquiry and the Hearing."

In a letter dated August 28, 2008, Dean Potempa advised Martinson that she had decided to reject the GRB's recommendation and uphold Martinson's expulsion. According to Dean Potempa, Martinson's "pattern of non-responsiveness to all sources of communication including [her] refusal to accept material from [Loveland-Cherry] regarding the Hearing and refusal to open the attachment to the email from Dr. Loveland-Cherry . . . [we]re inexcusable." Dean Potempa also stated that Martinson's "disruptive behavior" and "inappropriate communication style" indicated that Martinson was not capable of satisfying the School of Nursing's requirements.

No. 12-2230, *Martinson v. Regents of the University of Michigan*

B.        Procedural History

Martinson subsequently filed the present action in the District Court under 42 U.S.C. § 1983. Her six-count Complaint named Loveland-Cherry, Lynch-Sauer, and Hagerty as defendants in their official and individual capacities along with the University's Board of Regents, asserting that they had violated Martinson's right to substantive and procedural due process under the federal and Michigan constitutions.  In addition to damages, Martinson sought a declaratory judgment under Rule 57 and 28 U.S.C. § 2201 that would void her expulsion.

Relying on Rules 12(b)(1) and 12(b)(6),[1] the District Court partially granted the defendants' motion to dismiss on September 28, 2011, ruling that Martinson's state-law claims were barred by Eleventh Amendment sovereign immunity and finding that Martinson failed to state a plausible substantive due process claim. The District Court also found, however, that Martinson had alleged sufficient facts to move forward on her procedural due process claim and noted that injunctive relief remained available if the claim proved meritorious.

While their motion to dismiss was pending, the defendants moved for summary judgment. Although Martinson had opposed the motion to dismiss and prematurely had attempted to appeal its partial granting,[2] she failed to file a response to the motion for summary judgment despite being

[1] The motion to dismiss expressly invoked only Rule 12(b)(6), but defendants' reply in support of the motion "note[d] that their Eleventh Amendment immunity defense implicate[d] the [c]ourt's subject matter jurisdiction . . . under Rule 12(b)(1)." The District Court reviewed Martinson's claims under both Rules.

[2] On May 22, 2013, this Court dismissed the attempted appeal, No. 11-2363, because the District Court's order of September 28, 2011, "disposed of fewer than all the claims or parties involved in this action . . .did not direct entry of a final, appealable judgment under Federal Rule of Civil Procedure 54(b)[,]" and was not "an immediately appealable 'collateral order.'"

afforded extensions of time amounting to three months "to fully devote to . . . [it]." Martinson also did not appear at the scheduled hearing on the motion for summary judgment.

On August 16, 2012, the District Court granted summary judgment against Martinson and dismissed her Complaint with prejudice under Rule 56. Martinson timely appealed.

**II.**

Although she has identified as many as six related issues, Martinson essentially raises only two claims of error on appeal: (1) the dismissal of her substantive due process claim under Rule 12(b)(6) and (2) the dismissal of her procedural due process claim under Rule 56. We begin with Martinson's most promising claim, the alleged deprivation of procedural due process, which survived Appellees' motion to dismiss but failed at the summary judgment stage.

**III.**

We review de novo the grant of a motion for summary judgment under Rule 56, drawing all reasonable inferences in favor of the non-moving party. *Branham v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010) (citation omitted). "Summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)). The non-moving party "may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (internal quotation marks and citation omitted), nor will a "mere scintilla of evidence" discharge its burden, *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327,

335 (6th Cir. 2010) (internal quotation marks and citation omitted). Instead, to survive a well-supported motion for summary judgment, the non-moving party "must make an affirmative showing" of evidence sufficient to allow a trier of fact to find in its favor. *Alexander*, 576 F.3d at 558 (citation omitted).

These well-settled principles are dispositive here, and we affirm the grant of summary judgment on Martinson's procedural due process claim. There is little question that Appellees' motion for summary judgment was well supported, marshaling more than thirty exhibits—including deposition excerpts, responses to written discovery, and written correspondence—and as many pages of legal authority to secure the dismissal of Martinson's Complaint. Martinson, by contrast, made no showing whatsoever in response to the motion, neither filing a response nor appearing at the motion hearing. On that basis alone, the District Court would have been justified in granting summary judgment against her. *See Alexander*, 576 F.3d at 558 ("[T]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." (citation and internal quotation marks omitted)).

Although Martinson contends that her case is "somewhat unique" because she is *pro se*, she appropriately recognizes that this "status gives her no quarter from her requirement to answer the Summary Judgment motion." (Appellant Br. at 32-33); *see also United States v. Ninety-Three Firearms*, 330 F.3d 414, 427 (6th Cir. 2003) ("[T]his court clearly has held that no . . . rule providing 'special assistance' exists with respect to nonprisoner pro se litigants [on summary

judgment].") Nevertheless, the District Court went to great lengths to accommodate Martinson because she was without legal representation.

In its September 28, 2011, opinion and order granting Appellees' motion to dismiss, the District Court ordered Martinson to respond to Appellees' motion for summary judgment no later than October 21, 2011. At the time, the motion had been pending since August 8, 2011. After Martinson requested an extension, the District Court gave her until November 30, 2011, to file a response. The District Court expressly recognized that Martinson had been without counsel since November 5, 2010, observing that it already had granted her "multiple extensions" and "afforded her great leniency in pressing forward with her claims" as a result. Still, Martinson did not file a response.

On June 5, 2012, the District Court scheduled a hearing on the motion for summary judgment and gave Martinson another two weeks—until June 19, 2012—to respond. Martinson neither responded to the motion nor attended the hearing. Finally, on August 16, 2012, the District Court granted the motion for summary judgment and dismissed Martinson's Complaint with prejudice. Accordingly, Martinson had more than ten months between the filing of the motion for summary judgment and the final extended deadline by which the District Court required her to respond to it. She chose not to do so. As the District Court admonished in dismissing Martinson's Complaint, "the law cannot reward such calculated inaction."

Martinson rejoins, contrary to our precedents, that her failure to respond to the motion for summary judgment was not a sufficient ground upon which to grant it. *But see Alexander*, 576 F.3d at 558. Even so, however, Martinson does not contend that the District Court failed to "look to the facts on record to determine if a factual dispute exists." Instead, she disputes the *conclusions* that the District Court *drew* from those facts. According to Martinson, "[t]he biggest factual question . . . is whether [the individual Appellees] were acting out of personal dislike for [her] and a personal desire to remove her from the program." But the individual Appellees' personal feelings about Martinson are entirely irrelevant to the question of whether Martinson received the constitutionally adequate "notice, and . . . opportunity to be heard" that procedural due process guarantees. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005) (citation omitted).

As the District Court noted at the pleading stage of this matter, this court has determined that "the Due Process Clause is implicated by higher education disciplinary decisions." *Id.* at 633. But, recognizing that "[t]he *amount* of process due will vary according to the facts of each case," *id.* at 634 (emphasis added), the District Court expressly reserved the question of whether Martinson received constitutionally sufficient process for review on summary judgment. At the summary judgement stage, the District Court answered this question in the affirmative: "Plaintiff had both adequate notice and sufficient opportunity to be heard."

With regard to adequacy of notice, the District Court found as follows:

(1)    that the October 8, 2007, mid-semester warning that Martinson received from Bohn put her on notice "that her conduct with patients and her academic performance were matters of concern that [she] needed to address";

(2)     that the October 17, 2007, meeting between Loveland-Cherry, Hagerty, and Martinson and the letter from Loveland-Cherry that Martinson received at the meeting's conclusion "describ[ed] several of the behaviors that allegedly were disrupting the teaching environment," including confronting clinical staff in an argumentative manner and engaging in extended and hostile interactions with fellow students and faculty;

(3)     that the second letter Loveland-Cherry sent Martinson on October 22, 2007, which included a six-page summary of the incidents comprising the putative honor code violation at issue, gave her "even more specific information regarding . . . the basis of the conduct code inquiry"; and

(4)     that, on November 7, 2007, two days prior to the CAASS hearing on November 9, 2007, Loveland-Cherry emailed Martinson a packet of information regarding the hearing after Martinson refused to accept the packet when Loveland-Cherry attempted to hand it to her in person.

Regarding Martinson's opportunity to be heard, the District Court found the following:

(1)     that, after Martinson stated that she could not attend the preliminary hearing on October 22, 2007, Loveland-Cherry's secretary, Tara Engholm, sent Martinson an email on October 30, 2007, rescheduling the preliminary hearing for November 5, 2007; although Martinson admits having received the email, "she chose not to respond or defend herself until *after* the hearing already was in progress" (emphasis in original);

(2)     that, despite receiving the information packet about the CAASS hearing from Loveland-Cherry on November 7, 2009—after refusing to accept it in person—Martinson, again, did not attend the hearing and, again, did not offer any response to the charges against her; and

(3)     that, although a copy of the CAASS panel report was sent to Martinson on November 14, 2007, along with exhibits, advising Martinson that she could submit a statement to CAASS for consideration before a final decision was rendered on November 16, 2007, she again made no response until after she was expelled.

To the findings on notice, Martinson has no real answer, relying on the Supreme Court's decision in *Mullane v. Central Hanover Bank & Trust Company*, 339 U.S. 306, 314 (1950), for the proposition that Appellees were required to employ notice "reasonably calculated, under all the

circumstances," to apprise her of the charges against her. But Martinson does not fare any better under *Mullane* than under the test this court articulated in *Flaim*, 418 F.3d at 634 (relying on *Mathews v. Eldridge*, 424 U.S. 319 (1976)), which varies "depending upon the nature of the interest affected, and the circumstances of the deprivation," *id.* (citation and internal quotation marks omitted). Martinson was expelled from the School of Nursing for failing to "maintain compassionate and caring relationship [sic] with colleagues and others with a commitment to the fair treatment of individuals . . . [and to avoid] any and all prejudicial actions, any form of harassment or threatening behavior, or disrespect for effect [sic] of one's actions on others." Assuming *arguendo* that the mid-semester warning of October 8, 2007, did not apprise Martinson of the alleged conduct that resulted in this failure, there is little question that the letter and meeting of October 17, the second letter and summary of October 22, the information packet of November 7, and the CAASS panel report of November 14 did. Accordingly, the District Court did not err in concluding that Martinson received constitutionally sufficient notice.

On the question of opportunity for hearing, Martinson has a better but equally unavailing argument. Martinson contends, for example, that the seven-day delay between October 30, 2007, and the preliminary hearing on November 5, 2007, "[wa]s not enough for her to prepare an adequate defense." And when she successfully pursued an administrative appeal to the GRB, she contended that the scheduling of the November 9, 2007, CAASS hearing four days after the November 5, 2007, preliminary hearing was unreasonable. The GRB's agreement with Martinson supports this argument.

But as Dean Potempa concluded, the GRB did not "take into account the full history of all attempts to communicate with [Martinson] both for the Preliminary Inquiry and the Hearing." Martinson failed to attend either the November 5, 2007, preliminary hearing or the CAASS hearing on November 9, 2007. She also failed to respond to Engholm's email regarding the scheduling of the preliminary hearing—despite having six days' lead time—until after the hearing already was in progress. She refused even to accept materials from Loveland-Cherry regarding the CAASS hearing when Loveland-Cherry attempted to hand them to her, and she thereafter refused to review the materials when Loveland-Cherry subsequently emailed them to her. Additionally, Martinson failed to submit a statement to CAASS regarding her potential expulsion—despite being expressly invited to do so—until after the expulsion already had been approved. The post hoc statement that Martinson did submit failed to rebut—or even to address—the conduct on which her expulsion was based. Each these failures was a missed opportunity to be heard.

Such conduct was, as Dean Potempa put it, "inexcusable." Martinson "simply chose not to respond and defend" herself during the administrative proceedings, and she demonstrated similar scorn for the summary judgment proceedings before the District Court. Martinson's procedural due process claim must therefore fail.

**IV.**

So, too, must Martinson's substantive due process claim, which did not survive comparatively lenient review under Rule 12(b)(6), fail. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("Once a case has progressed to the summary

judgment stage . . . the liberal pleading standards under . . . the Federal Rules are inapplicable." (internal quotation marks, citations, and alterations omitted)). We review the dismissal of a claim under Rule 12(b)(6) de novo, *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009) (citation omitted), mindful of the Supreme Court's instruction that a claim may only survive a motion to dismiss if "it 'contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face,'" *id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the plausibility standard does not amount to a "probability requirement," it requires "more than a sheer possibility that a defendant has acted unlawfully." *Estate of Barney v. PNC Bank*, 714 F.3d 920, 924 (6th Cir. 2013) (internal quotation marks and citation omitted). A complaint satisfies this standard when its factual content allows a court reasonably to draw the inference that the relief it requests is warranted against the defendant that it names. *Id.*

As an initial matter, we note that the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause. *See Rogers v. Tenn. Bd of Regents*, 273 F. App'x 458, 463 (6th Cir. 2008) (citing *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 22-23 (1985) and *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91-92 (1978) and noting that the High Court has only assumed, *arguendo*, that such a right exists). Seeking to fill that void, our own precedent suggests that the opposite is true. *See id.* ("[Appellant's] interest in her nursing education is not protected by substantive due process."). Moreover, in *Bell v. Ohio State University* we expressly stated that, in the absence of an equal protection violation, "we c[ould] see

no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process." 351 F.3d 240, 251 (6th Cir. 2003). Martinson alleges no equal protection violation, and her complaint cannot be read to allege facts that could amount to a denial of equal protection.

Martinson acknowledges this precedent but contends that her substantive due process rights were violated through "arbitrary and capricious" government action. But Martinson's expulsion from the School of Nursing was neither arbitrary nor capricious. Each of the individual Appellees had *witnessed* Martinson's failure to "maintain compassionate and caring relationship [sic] with colleagues and others . . .[and to avoid] any form of harassment or threatening behavior, or disrespect for effect [sic] of one's actions on others." The decision to expel Martinson could not have been arbitrary or capricious when those personal experiences were reconciled with the similar—and, in some cases, more extreme—reported experiences of Martinson's peers, staff, and patients at the School of Nursing.[3] Therefore, the substantive due process claim that Martinson has alleged is not plausible and, like her procedural due process claim, must fail.

---

[3] Accordingly, Martinson's suggestion that her expulsion reflects "individual animus" implicating equal protection interests is not plausible. Neither does Martinson's reliance on Dr. Harper's determination that her conduct did not require immediate removal under the University's emergency mental health policy or its bylaws for behavioral misconduct salvage her claim. Martinson was expelled for violations of the student code of conduct, not the University's emergency mental health policy or bylaws, and that decision was not arbitrary or capricious for the reasons stated above.

**V.**

For these reasons, we AFFIRM the summary dismissal of Martinson's procedural due process claim under Rule 56 as well as the dismissal of her substantive due process claim under Rule 12(b)(6).