RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JACQUELYN MARES, M.D.,

           *Plaintiff-Appellant*,

    *v.*

MIAMI VALLEY HOSPITAL; PREMIER HEALTH PARTNERS; WRIGHT STATE UNIVERSITY; JEROME L. YAKLIC, M.D.; G. THEODORE TALBOT, M.D.; ALBERT F. PAINTER, Psy.D.,

           *Defendants-Appellees*.

> No. 23-3475

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:20-cv-00453—Michael J. Newman, District Judge.

Decided and Filed:  March 21, 2024

Before:  GIBBONS, BUSH, and MURPHY, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:**  Marc D. Mezibov, MEZIBOV BUTLER, Cincinnati, Ohio, Rachel Rutter, MAREK WEISMAN, LLC, Chicago, Illinois, for Appellant.  Karen T. Dunlevey, JACKSON LEWIS PC, Cincinnati, Ohio, for Appellees Miami Valley Hospital and Premier Health Partners. Benjamin M. Flowers, Zachery P. Keller, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees Wright State, Painter, Talbot, and Yaklic.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   Dr. Jacquelyn Mares was dismissed from Wright State University Boonshoft School of Medicine's ("WSU") obstetrics and gynecology residency program after a long series of complaints and escalating discipline stemming from her unprofessional behavior.  As a result of this dismissal, Mares was terminated from her position at Miami Valley Hospital ("MVH"), where she was employed during, and through, the course of her residency.  Mares sued WSU, MVH, Premier Health Partners (MVH's owner-operator), and several WSU employees, alleging violations of her procedural and substantive due process rights along with various contract-based state law claims.   The district court granted summary judgment to the defendants on each claim.  For the reasons outlined below, we affirm.

I.

Dr. Mares graduated from medical school in 2015 and matched with a preliminary, one-year residency program at Hofstra University.  Naturally, Mares sought opportunities to enroll in a categorical, full-length residency program over the course of her temporary term.  She applied to a handful of institutions and ultimately selected WSU, joining its OB/GYN program as a second-year resident.  As part of the transition, Mares undertook several obligations.  For example, she signed WSU's Graduate Medical Education Agreement.   The Agreement "outline[d] the terms and conditions of [Mares's] appointment" to WSU's residency program, including the school's policies related to resident responsibilities, conditions for reappointment or promotion, and the due process procedures surrounding discipline and dismissal from the program.

Additionally, Mares agreed to work at MVH, the program's employing institution.  She formalized this arrangement by signing a Resident-Fellow Agreement with both WSU and MVH.  The Resident-Fellow Agreement acted as Mares's employment contract:  it set out the expectations for each party, established that MVH employed Mares on an at-will basis, and outlined the conditions under which MVH could immediately terminate the Agreement with

Mares. The Graduate Medical Education and Resident-Fellow Agreements both referenced Item 504 of WSU's Resident Manual, which detailed how, and under what conditions, WSU could seek to discipline, and potentially remove, a resident from the program.

In starting the new position, Mares quickly realized the "huge difference" between her last residency program and this one. DE 52, Mares Dep., Page ID 889. Residents at Hofstra adopted more "rigid" roles due to the high volume of patients that the program oversaw. As a result, Mares had less exposure to clinical opportunities than the second-year residents that attended WSU from the start. And the feedback she received during her initial rotations reflected her inexperience, as Mares's supervisors noted that her surgical skills were lacking.

At the same time, Mares's supervisors also expressed concern over her professionalism. For example, after her first rotation, Dr. Michael Galloway, then director of WSU's OB/GYN residency program, remarked that Mares should develop her communication skills and strive to keep others more informed. And after her second rotation, Dr. Nancy Lo stated that Mares must work both on her patient and faculty relationships, highlighting that she ought to improve in "accepting timely feedback in a constructive manner." DE 52-28, Mem. for R., Page ID 1322.

In January of 2017, WSU's Clinical Competency Committee, the entity responsible for assessing the progress of residents, met with Mares to discuss her progress and provide feedback. The Committee emphasized that Mares needed to better her "professionalism in relating to students, nurses and other residents." DE 52-30, Resident Feedback Meeting, Page ID 1324. Likewise, the Committee asked that Mares be more understanding, patient, and a better communicator. The Committee issued this feedback shortly before it received several complaints from medical students under Mares's instruction. One complaint characterized Mares as "extremely hostile to every medical student she worked with" and that she "insulted attendings, fellow residents, and students routinely." DE 52-32, Student Mistreatment Concern, Page ID 1327.

Mares received mixed feedback on her professionalism in the spring of 2017; but, in May, the Clinical Competency Committee advanced Mares to her third year of residency. Yet the Committee again expressed apprehension over Mares's "overall professionalism" and

expressed that it "expect[s] to see progression on these fronts if [Mares is] to complete the program on schedule." DE 52-41, Clinical Competency Committee Letter, Page ID 1340. A few days later, Dr. Galloway issued Mares an official letter of warning on behalf of the program. In it, he highlighted problems with Mares's "Interpersonal/Communication and Professionalism," specifically that her "demeanor, attitude, [and] willingness to be responsive are a major concern," stressed a need for "significant improvement" on the subject, and outlined a personalized remediation plan. DE 52-43, Letter of Warning/Concern, Page ID 1346. Less than a month after receiving the letter, the program suspended Mares for five days after she shirked her responsibility to check in on a patient, lost her temper when confronted about the situation by a supervisor, and arrived twenty minutes late to the meeting set to discuss these events and her behavior.

Despite these repeated warnings, Mares's professionalism did not meaningfully improve. Over the next several months, Mares showed moments of growth but still received further critiques of her behavior. Ultimately, the program placed her on probation in March 2018. The Clinical Competency Committee notified Mares of this decision in writing, and contended that, although she showed "[s]ome improvement," her "deficiencies in the areas of professionalism and interpersonal/communication . . . interfere[d] with teaching by the Attending" and "have a negative effect on transitions of patient care and thus impact[ed] patient safety." DE 52-65, Notice of Probation, Page ID 1676.

After the probation decision, Mares again started showing some improvement. She frequently met with Dr. Theodore Talbot, the next director of WSU's OB/GYN residency program; showed pockets of "dramatic improvement" related to her professionalism, *see* DE 52-19, Resident Evaluation, Page ID 1306; and advanced to her fourth year of residency. Again, however, Mares's behavior shifted a few months later. In the fall of 2018 Mares exhibited three instances of unprofessional behavior that raised further questions about her temperament and ability to care for patients thoughtfully.

Following this downward trend, the Clinical Competency Committee voted, six-to-two, in favor of dismissing Mares from the residency program. Talbot later accepted the Committee's recommendation on behalf of the program and notified Mares of the result in writing. Mares

appealed the dismissal under Item 504 of the Resident Manual and WSU, as required by that rule, convened a panel to review the program's decision. The panel consisted of three members of WSU's medical faculty, one of whom was recommended by Mares. The panel held a hearing to determine if substantial evidence was present to support Mares's dismissal. The panel's role was to then make a recommendation to Dr. Margaret Dunn, Dean of WSU's Medical School, and Dr. Teresa Zyrd, MVH's vice president, as to whether the pair should accept, reject, or modify the program's decision.

The hearing was comprehensive. Talbot presented the justification for the program's decision, focusing on Mares's unprofessionalism, and Mares, with the help of her advocate Dr. Melanie Glover, argued that dismissal was too drastic an action. After considering both of these positions and the submitted material, the panel recommended that Drs. Dunn and Zyrd take a revised action against Mares. The panel suggested that Mares remain on probation until graduation and that any additional violation of WSU's academic and professional standards would result in immediate termination from the residency program. DE 52-66, Due Process Hr'g Recommendation, Page ID 1682.

On review, Drs. Dunn and Zyrd rejected the panel's recommendation and affirmed the program's decision to dismiss Mares in light of her "persistent demonstration of unprofessional and insubordinate conduct." DE 52-7, Letter Dated Dec. 3, 2018, Page ID 1266. Mares appealed again, this time to WSU's Provost, Susan Edwards. And after reviewing portions of Mares's disciplinary file, the Clinical Competency Committee's notice of dismissal, a transcript of the panel hearing and its decision, and a variety of other documents, Edwards also affirmed the dismissal decision. WSU formally dismissed Mares from its residency program and, as a result, MVH terminated her employment.

Mares then sued WSU; MVH; Premier Health Partners; Dr. Theodore Talbot; Dr. Jerome Yaklic, Chair of WSU's Department of Obstetrics and Gynecology; and Dr. Albert Painter, Associate Director of Medical Affairs at WSU. Mares alleged that these individuals and entities violated her procedural and substantive due process rights, her equal protection rights, and Ohio contract law.

The district court granted summary judgment for the defendants, and Mares now appeals that decision.[1]

## II.

We review the grant of summary judgment de novo. *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021). Summary judgment is appropriate where the evidence presents no genuine dispute of material fact, and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). This court must draw all reasonable inferences in favor of the non-moving party in evaluating a motion for summary judgment. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004).

## III.

### A. *Procedural Due Process*

Mares primarily contends that her termination from WSU's residency program violated her procedural due process rights under the Fourteenth Amendment. She bases this argument on two contentions: First, that the district court applied the wrong legal standard; and, second, that WSU's termination process was constitutionally flawed even under that more relaxed, incorrect approach.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish a procedural due process claim, one must show that (1) they had a life, liberty, or property interest protected by the Due Process Clause; (2) they were deprived of one of these protected interests; and (3) the state did not afford them adequate procedural rights in depriving them of the protected interest. *Peterson v. Johnson*, 87 F.4th 833, 836 (6th Cir. 2023); *Med Corp. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).

Here, and for the purposes of her procedural due process claim, the parties agree that Mares's termination from WSU's residency program constitutes a deprivation of a protected

---

[1]Mares did not appeal the district court's grant of summary judgment on her equal protection claim.

property interest.  *See J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 297 (6th Cir. 2019).  We thus may assume the point.  The question before us, then, is whether WSU, in dismissing her from the program, afforded Mares appropriate due process.  We hold that it did.

Before arriving at that outcome, we must first address what level of due process WSU owed Mares.  Mares argues that, as a medical resident engaged in substantive clinical work, this court should analyze her procedural due process claim as if she were an employee of WSU.  WSU, however, contends that it did not employ Mares and that, given the academic nature of medical residency, she is owed only the amount of process afforded to a student.  This court has not yet opined on the type of process due to medical residents; but, considering the reasoning from our sister circuits and the contents of the WSU Resident Manual, we hold that medical residency is more akin to an educational program than full employment and that Mares's claim should be evaluated as such.

To start, every circuit to address the question agrees that medical residents receive the due process protections of students.[2]  *See Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989); *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 784–86 (2d Cir. 1991); *Fenje v. Feld*, 398 F.3d 620, 624–27 (7th Cir. 2005).  Underpinning these decisions is an understanding that "the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program."  *Davis*, 882 F.2d at 974.  In that vein, the practical experience and monetary benefits that individuals receive during their residency are conditioned on their continued enrollment in the program.  Residency serves as a necessary means to becoming a licensed physician; it is not an end in and of itself.

Likewise, the factual record demonstrates that the primary focus of WSU's residency program is education.  WSU describes its residency program as part of its "Graduate Medical Education" and states that residents are selected, in part, by members of its "teaching faculty."  DE 54-23, WSU School of Medicine Policies & Procedures, Page ID 2038, 2047.  Additionally, in its Graduate Medical Education Policies & Procedures Manual, the school notes that

---

[2]District courts in several unpublished decisions have also found that medical residents are owed the same due process protections as students.  *See Halverson v. Univ. of Utah Sch. of Med.*, 2007 WL 2892633, at *11 (D. Utah Sept. 28, 2007); *Allahverdi v. Regents of Univ. of N. M.*, 2006 WL 1313807, at *18 (D.N.M. Apr. 25, 2006).

"[p]hysicians selected as participants in the program are offered an educational experience approved by the Accreditation Council on Graduate Medical Education." *Id.* at 2039. Once enrolled in the program, residents are exposed to an "educational environment" and "curriculum" shaped by the school's Graduate Medical Education Committee, which "is responsible for oversight, monitoring, [and] advising on all aspects of each residency and fellowship education program, including the learning and working environment at all participating sites." *Id.* at 2041. In essence, every step in the life cycle of a WSU resident—from selection to day-to-day experiences—is immersed in education and academics. Considering the information above, we hold that WSU's medical residency program is an extension of medical education and that its residents are owed the amount of due process required for students.

Students dismissed for academic reasons are afforded only minimal due process protections.[3] *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 87–90 (1978); *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003). In these situations, "a student is entitled only to notice that his or her academic performance was not satisfactory and a 'careful and deliberate' decision regarding their punishment." *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549 (6th Cir. 2013) (quoting *Horowitz*, 435 U.S. at 85.) "But the university need not provide a hearing." *J. Endres*, 938 F.3d at 298.

Here, WSU supplied Mares with more than enough process. It is undisputed that Mares accumulated several complaints about her unprofessional behavior from medical students, colleagues, and WSU faculty members throughout her residency. In less than two years at WSU, Mares had been formally warned about her performance, suspended for several days, and placed on probation. Despite these formal warnings, Mares continued with her problematic conduct and, after deliberation, WSU's Clinical Competency Committee recomended dismissing her

---

[3]WSU argues that Mares was dismissed for academic, not disciplinary, reasons. Although Mares's briefing is silent on this issue, we agree with this characterization. "Courts have frequently held that an academic dismissal may be properly based on more than simply grades, particularly in a medical-professional context." *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 550 (6th Cir. 2013). More to the point, this court has held, on multiple occasions, that dismissal for unprofessional behavior in medical education constitutes an academic decision. *Al-Dabagh v. Case W. Rsrv. Univ.*, 777 F.3d 355, 359 (6th Cir. 2015) ("Al-Dabagh's dismissal on professionalism grounds amounts to a deference-receiving academic judgment for several reasons."); *Ku v. Tennessee*, 322 F.3d 431, 435–37 (6th Cir. 2003); *Eid v. Wayne State Univ.*, 2023 WL 2523303, at *1 (6th Cir. Mar. 15, 2023). Mares's dismissal for unprofessional behavior is likewise considered an academic dismissal.

from its residency program.  In doing so, the Committee set in motion WSU's extensive internal procedures, memorialized in Item 504 of the Graduate Medical Education Policies & Procedures, which ensure that residents facing an adverse action are provided with quintessential due process.

Item 504 mandates six distinct events.  First, the program will issue a written notice to the resident, informing them of the program's intended action, the justifications for said action, and their right to appeal the decision.  Second, and before the adverse action progresses, the program director will meet with the resident to determine how best to proceed and whether to continue with the proposed adverse action.  Third, the resident can appeal the program's adverse action to a panel of three WSU faculty members, one of which is chosen by the resident.  The panel then holds a hearing "to determine if there is substantial evidence to support the" adverse action.  DE 54-23, WSU School of Medicine Policies & Procedures, Page ID 2078.  During the hearing, the resident is afforded the opportunity to bring an attorney and a faculty advocate, present evidence, call witnesses, and rebut the program's reasoning for the adverse action.  Fourth, the panel then makes a "written recommendation" on the program's decision to the Dean of WSU's medical school and the chief executive officer of the employing institution.  *Id.* at 2079.  The panel can recommend affirming the program's decision, taking a revised action, or not affirming the decision.  Fifth, the Dean and the chief executive officer of the employing institution then decide whether to accept, reject, or modify the program's decision.  And, finally, if they decide to affirm the adverse action, the resident can make one final appeal to the WSU provost, who then notifies the resident in writing of their decision.

WSU followed Item 504 to the letter in dismissing Mares from its residency program.  After the Committee vote, Dr. Talbot, then-director of WSU's OB/GYN residency program, informed Mares about the Committee's dismissal recommendation and sought her side of the story.  A few days later, Talbot told Mares that he accepted the Committee's recommendation and provided her with written notice of such.  Mares then appealed the dismissal to a panel to review the director's decision.  The panel held a hearing to discuss the matter, and Mares brought Dr. Melanie Glover, an OB/GYN faculty member at WSU, to advocate on her behalf during the proceeding.  After the hearing, the panel recommended modifying the director's decision,

suggesting that Mares remain on probation until graduation and that she be dismissed immediately from the program upon violation of any additional section of the WSU professional standards. The panel's recommendation went to Drs. Dunn, Dean of WSU's medical school, and Dr. Zyrd, Vice President at MVH. After reviewing the materials submitted to the panel, as well as Mares's program record, Drs. Dunn and Zyrd affirmed the program's decision to dismiss Mares. Mares appealed to WSU's provost, Edwards, who conducted a diligent review of the record and sided with the program.

Mares claims that this exhaustive process was insufficient. She argues that WSU's decision to dismiss her, despite the panel recommending that she be given one last chance to remain in the residency program, violated her due process rights.**4** This claim is meritless. The panel's recommendation was just that, a recommendation. Item 504 instructs the medical school Dean and chief executive officer from the employing institution to make their own judgment as to the program's decision. They were not required to follow the panel's recommendation. Likewise, Provost Edwards was neither bound by the panel nor by the conclusion of Drs. Dunn and Zyrd. As a result, we hold that WSU and its administrators did not violate Mares's procedural due process rights when it dismissed her from its OB/GYN residency program.⁵ Summary judgment for the defendants, therefore, is appropriate on these claims.

*B. Substantive Due Process*

Relatedly, Mares next argues that WSU violated her substantive due process rights when it dismissed her from the program. Specifically, Mares claims that "WSU arbitrarily and capriciously deprived her of her liberty and property interests in her professional pursuits and

---

**4**To substantiate this contention, Mares points to a Fourth Circuit case, *Jones v. Board of Governors of University of North Carolina*, 704 F.2d 713 (4th Cir. 1983). *Jones,* however, is both factually and legally distinguishable. On the facts, the student in *Jones* challenged a *disciplinary* action, not an academic one. *Id.* at 715. Students facing disciplinary actions are provided more process than students, like Mares, confronting an academic-based adverse action. *See Yoder*, 526 F. App'x at 549. As for the legal question, the *Jones* court addressed a preliminary injunction and did not reach a conclusion on the merits of her due process claim. *See Jones*, 704 F.2d at 715, 717. As a result, the analysis in *Jones* is inapplicable to Mares.

**5**To the extent that Mares asserts a procedural due process claim against MVH, it also fails. MVH is a private entity, and Mares did not have a constitutionally protected right to remain employed at MVH. *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 564–65 (6th Cir. 2012).

choice of livelihood." CA6 R. 21, Mares Br., at 20.  But like her procedural argument, Mares's substantive due process claim is meritless.

Substantive due process, also stemming from the Fourteenth Amendment, "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).  However, "[t]he interests protected by substantive due process are of course much narrower than those protected by procedural due process." *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003).  In that vein, "the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause." *Martinson v. Regents of Univ. of Mich.*, 562 F. App'x 365, 375 (6th Cir. 2014).  To the contrary, our precedent has explicitly held that substantive due process does not protect a student's interest in continued enrollment in higher education.  *Bell*, 351 F.3d at 251 ("[W]e can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process."); *Doe v. Miami Univ.*, 882 F.3d 579, 598–99 (6th Cir. 2018); *Martinson*, 562 F. App'x at 375; *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 436–37 (6th Cir. 2006).

Even assuming *arguendo* that she had a protected interest, Mares fails to show that WSU's decision was either arbitrary and capricious or conscience-shocking.  *See Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014).  This standard "applies to only the most egregious official conduct, conduct that is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 547–48 (6th Cir. 2012) (alteration in original) (internal citations and quotation marks omitted).

Here, Mares does not dispute the occurrences of unprofessional conduct that led to her discipline and eventual dismissal from the residency program.  Talbot and the Clinical Competency Committee agreed that, as a result of these repeated behaviors, Mares was unfit to graduate.  And although a panel of three WSU faculty members suggested that Mares be given one last opportunity to complete her residency, there was nothing egregious or offensive about either Drs. Dunn and Zyrd's or Provost Edwards's decision to side with the program after

reviewing the relevant information. Courts "should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 225 n.11 (quoting *Horowitz*, 435 U.S. at 96 n.6 (Powell, J., concurring)). Given this, WSU did not violate Mares's substantive due process rights in dismissing her from its residency program.[6]

### C. State Contract Claims

Finally, Mares brings two state contract claims against MVH.[7] First, Mares contends that MVH breached its contractual duties when it terminated her after her dismissal from WSU's residency program. Second, Mares raises an implied good faith claim and alleges that MVH's termination decision breached the spirit of their agreement. Neither claim has merit.

To bring a breach of contract claim under Ohio law,[8] a claimant must "establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018). Here, Mares claims that MVH breached the Resident-Fellow Agreement, which operated as her employment contract, when it terminated her following her dismissal from WSU's residency program. In the alternative, she claims that whether MVH breached the contract is a material question of fact that must be resolved by a jury. However, the unambiguous language of the contract shows otherwise. MVH could disband the Resident-Fellow Agreement "immediately" if Mares "is terminated by the [WSU residency] Program." DE 52-12, Resident Fellow Agreement, Page ID 1283. As discussed

---

[6]The three WSU employee defendants also raise, briefly, the question of qualified immunity. The district court did not address the question in its summary judgment order and Mares does not mention the concept in her briefs. Given the underdeveloped arguments on the matter, and the outcome on Mares's claims, this court does not address the topic of qualified immunity.

[7]References to MVH in this section also include Premier Heath, the organization that operated MVH.

[8]Both parties agree that the Resident-Fellow Agreement is governed by Ohio law.

above, WSU lawfully dismissed Mares from its program after following its due process obligations under Item 504 of the Resident Manual.  As a result, MVH acted within the scope of the contract when it dismissed Mares, and there is no genuine dispute of material fact on the question of breach.

Given that, Mares's implied good faith argument also cannot stand.  Because MVH did not breach its obligations under the Resident-Fellow Agreement, and because "Ohio does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing," Mares has no basis to bring an implied good faith claim as a matter of law.  *Cincinnati Dev. III, LLC v. Cincinnati Terrace Plaza, LLC*, 2023 WL 2487348, at *8 (6th Cir. Mar. 14, 2023) (per curiam) (citing *Lucarell*, 97 N.E.3d at 469).  Summary judgment, therefore, is appropriate for MVH on each of Mares's contract claims.

IV.

For the reasons stated above, we affirm.